# OFFICE OF THE FEDERAL PUBLIC DEFENDER
# DISTRICT OF MARYLAND

NORTHERN DIVISION
TOWER II, 9th FLOOR
100 SOUTH CHARLES STREET
BALTIMORE, MARYLAND  21201-2705
TEL:  (410) 962-3962
FAX:  (410) 962-0872
TOLL FREE: (855) 213-8450

JAMES WYDA                                                                                                                        BRENDAN A. HURSON
FEDERAL PUBLIC DEFENDER                                                                         ASSISTANT FEDERAL PUBLIC DEFENDER

September 15, 2014

**Via ECF/CM**

The Honorable Catherine C. Blake
United States District Judge
United States Courthouse
101 W. Lombard Street
Baltimore, MD 21201

        Re:    U.S. v. Arthur Jeter, Criminal No. CCB-14-121

Dear Judge Blake:

      At the close of Friday's hearing, the Court granted both parties the opportunity to submit additional briefing in light of the testimony elicited at Friday's motions hearing.  Please accept this letter as Mr. Jeter's supplemental filing.  While this update is drafted without the benefit of a transcript, all representations of testimony from the hearing are the best recollection of both the undersigned and investigator William Kanwisher, who observed Friday's proceeding from counsel table.

      As my argument at the close of the hearing made clear, I do not believe the government elicited credible testimony to support the claim that Mr. Jeter was lawfully seized and arrested on October 23, 2013.[1]  While I believe inconsistencies in witness testimony coupled with other glaring

---

[1] In addition to drafting a statement of probable cause riddled with misrepresentations and critical factual omissions, Det. Clark's testimony at the motions hearing was repeatedly contradicted by the government's purported eyewitness, the CI.  First, the CI disputed Clark's testimony that Mr. Jeter carried a black sweatshirt to the car when he exited his mother's home on North Kenwood.  Consistent with his grand jury testimony, the CI noted that Mr. Jeter had "nothing" in his hands and got into the car before officers seized Mr. Jeter and recovered a handgun.  Further, Det. Clark incorrectly indicated that Mr. Jeter was among the first people called by the CI on the phone and feigned ignorance as to any other operations the CI may have been involved in.  The CI, however,

United States v. Jeter, CCB-14-121
September 15, 2014 Supplemental Filing Re: Motion to Suppress
Page 2 of 7

"red flags" of improper police conduct[2] warrant suppression, I note that the Court need not find any witness incredible to properly order suppression of the firearm. The application of existing law to the facts elicited at the hearing warrants suppression even under the "Terry stop" standard raised by the Court at the close of the hearing.[3]

"[W]hen [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen [a court can] conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n. 16 (1968). Thus, the first question for the Court to determine is when, if ever, Mr. Jeter was seized within the meaning of the Fourth Amendment. A person is "seized" within the meaning of the Fourth Amendment if, "'in view of all [of] the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" United States v. Gray, 883 F.2d 320, 322 (4th Cir. 1989) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)). Stated differently, "[a]n arrest requires *either* physical force (as described above) or, where that is absent, *submission* to the assertion of authority. " California v. Hodari D., 499 U.S. 621, 626 (1991) (emphasis in original). A court considers a number of factors in determining whether an officer's conduct would convey to a reasonable person that he is not free to leave including, but not limited to, "the number of police officers present during the encounter, whether they were in uniform or displayed their weapons, whether they touched the defendant, whether they attempted to block his departure or restrain his movement, whether the officers' questioning was non-threatening, and whether they treated the defendant as though they suspected him of 'illegal activity rather than treating the encounter as 'routine' in nature.'" Gray, 883 F.2d at 322-23.

---

noted that Mr. Jeter was not initially a target of the operation and, seemingly by chance, "just happened" to contact the CI soon after the CI failed to secure a gun from another person in an operation orchestrated by Det. Clark. Of course, Det. Clark disputed this point and testified that the CI may only have been involved in a "marijuana purchase" with another officer on the 23rd, further claiming that he (Det. Clark) was not involved and had no recollection of the details of that "other" matter. Buttressing the CI's testimony, the undersigned has found an entry in Maryland Judiciary Case Search reflecting a marijuana charge on the 23rd of October involving that other officer and Det. Clark, apparently confirming the CI's account as truthful.

[2] In addition to the above inconsistencies, testimony elicited at the hearing revealed undisclosed calls to internal affairs by the CI and his girlfriend, the failure to record or memorialize any of the critical interactions between the CI, Mr. Jeter, and the police, and the apparent inability of Det. Clark to recall any detail adverse to the government's case at all.

[3] Mr. Jeter contends he was arrested by police when they swarmed the vehicle after he entered it and thus contends that the government would need to establish that police had probable cause to arrest him. See Motion to Suppress, 1. For purposes of this supplement, however, I will address the Court's point that the seizure may only have required reasonable suspicion.

  Here, all witnesses testified that police intended to detain Mr. Jeter as they quickly approached the CI's car on October 23, 2013. More important to the objective "reasonable person" standard, all witnesses testified that at least four officers exhibited a tremendous show of force including the physical blocking of the vehicle Mr. Jeter was a passenger in, the loud pronouncement of their presence and intent to arrest the occupants of the car, and the aggressive initiation of a blockade of the vehicle by driving the "wrong way" down a one-way street to stop its egress. Thus, testimony established that Jeter was seized when the officers surrounded the vehicle. That Jeter was a passenger is of little moment. See Brendlin v. California, 551 U.S. 249, 257 (2007) ("We think that in these circumstances any reasonable passenger would have understood the police officers to be exercising control to the point that no one in the car was free to depart without police permission."). Similarly, that officers never spoke with Mr. Jeter is unimportant as the officers unambiguous show of force would lead a reasonable person in Mr. Jeter's position to conclude he wasn't free to leave. See United States v. Jones, 678 F.3d 293 (4th Cir. 2012) (finding a seizure of a person where two police conspicuously followed, then blocked, a defendant's car before quickly approaching the defendant as he exited the car). Further, that officers may not have physically grabbed him is immaterial as a seizure for Fourth Amendment purposes can occur before an officer physically grabs a suspect. United States v. Black, 707 F.3d 531, 538 (4th Cir. 2013) (rejecting the government's argument that a defendant was not seized until he was grabbed by officers or told that he was not free to leave because of the presence of other indicia of detention). Thus, Mr. Jeter was seized when officers stopped in front and behind CI's vehicle in an unabashed show of authority intended to stop his movement.

  The question then shifts to whether the seizure of Jeter was legally justified. To be lawful, a Terry stop "must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." Reid v. Georgia, 448 U.S. 438, 440 (1980). "The level of suspicion must be a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" Black, 707 F.3d at 539 (quoting United States v. Griffin, 589 F.3d 148, 152 (4th Cir. 2009)). "As such, 'the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" Id. (citing Terry, 392 U.S. at 21).

  Prior to the hearing, the government submitted that the stop of Jeter was justified because of information provided by the CI, the phone call between Jeter and the CI, and because of observations made at the scene of Jeter's arrest. Government Response, 6-7. However, after a full airing of the purported facts, the government failed to establish facts sufficient reasonable suspicion that Mr. Jeter possessed a firearm at the time he was seized.

<u>United States v. Jeter</u>, CCB-14-121
September 15, 2014 Supplemental Filing Re: Motion to Suppress
Page 4 of 7

The testimony elicited at the hearing established that at some point, the CI had a conversation with Jeter where Jeter agreed to provide the CI with "a banger."[4] In the CI's mind – and that of the officers - this meant Jeter was prepared to provide a handgun to the CI. The CI testified that he communicated with Jeter several times about the plan on October 22 and 23rd. The testimony established, however, that few of the details, if any, of this subsequent communication was shared with Det. Clark. In fact, it appeared from the testimony that, beyond the initial call in the presence of officers, few of the details of the conversations between CI and Jeter were ever known to Det. Clark (or any other officers).[5] What is clear is that officers never saw Mr. Jeter with a handgun *before* they seized him and thus relied exclusively on the representations of the CI and the telephone conversation the day before - a conversation that was not memorialized in any form- for their belief that Mr. Jeter was in possession of a firearm. Thus, a significant basis for the seizure rested on the CI's credibility as an informant.

"In cases where an informant's tip supplies part of the basis for reasonable suspicion, [a court] must ensure that the tip possesses sufficient indicia of reliability." <u>United States v. Perkins</u>, 363 F.3d 317, 323 (4th Cir. 2004). "The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable." <u>United States v. Wagner</u>, 989 F.2d 69, 72–73 (2d Cir.1993). In the similar context of probable cause, "[i]nformation may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of providing reliable information, or if it is corroborated in material respects by independent evidence." <u>Id.</u>

Prior to Mr. Jeter's arrest, the CI repeatedly proved himself to be a completely unreliable informant with a track record of providing wholly unreliable information. As noted, testimony established that he had apparently reached an agreement to secure a firearm from another person the night before the arrest of Mr. Jeter. That operation was, in many respects, the same as Mr. Jeter's in that the CI received oral confirmation on the phone (and in the presence of Det. Clark) that a handgun would be delivered to him at a specific place and time by an identified individual. Though Det. Clark apparently did not recall this operation (though he was apparently the "lead" officer in that operation, too), the CI's testimony established that Det. Clark was present for that purported firearm exchange in the same manner he was present for Mr. Jeter's - outside, waiting in his car, in constant contact with the CI. Based on the CI's testimony, it is clear that Det. Clark was aware that the CI didn't deliver the firearm as promised, thus diminishing, if not eviscerating, the CI's credibility as an informant. Indeed, after two failed attempts at delivering the promised "banger,"

---

[4] It remains unclear when this conversation occurred as Det. Clark testified differently than the CI on this critical point.

[5] Det. Clark testified that he was the CI's "contact" and thus the only person the CI communicated with in relation to the "operation" to get a gun from Mr. Jeter.

United States v. Jeter, CCB-14-121
September 15, 2014 Supplemental Filing Re: Motion to Suppress
Page 5 of 7

it remains debatable whether Det. Clark could rely on the CI's claim that a "banger" was, indeed, slang for a firearm.

The following day, CI's information proved faulty yet again. After the CI dropped off Mr. Jeter at his mother's address on North Kenwood Street, he promised Det. Clark that Jeter would soon have a handgun in his possession. Acting on the CI's "tip," authorities seized Jeter outside his home under false pretenses but found nothing on his person. The CI's "intelligence" proved itself to be unreliable for a second time.

It is true that CI testified that he texted and spoke with Mr. Jeter throughout the day on the 23rd, perhaps, even after the first (failed) arrest on the steps. He also testified that he spoke to Mr. Jeter and his stepfather about the purchase of a gun. If shared with Det. Clark, these conversations may have served to rehabilitate his two failed attempts at securing a gun, but testimony at the hearing reflected that none of these conversations were shared with police prior to Mr. Jeter's arrest and thus can play no role in assessing the legality of Mr. Jeter's seizure by police.[6]

Finally, there remains the nagging question of whether Jeter was carrying anything in his hands when he approached the car. The CI, who was mere feet from Mr. Jeter the whole time, unequivocally testified that Jeter had nothing in his hands when he left the Kenwood Street residence. Det. Hill, watching from an obscured viewpoint up the street, testified that she thought "he might have been carrying a black bag or something," though I cannot recall whether there was testimony that she shared this observation with Det. Clark. Even if she did, Clark likely did not hear it as testimony established that he was on the phone speaking with the CI when Mr. Jeter exited the home.[7] Both Clark and government witness Sgt. Davis testified that they saw Mr. Jeter throw a "black object" while he sat in the car - but neither saw him carrying anything *to* the vehicle or could credibly claim they did considering the timing of their arrival some 15 seconds after Jeter purportedly "ran" from a house mere yards up the street. In truth, these visual observations purportedly made by Clark and Davis came *after* the seizure of Jeter and thus cannot form the basis for reasonable suspicion warranting the seizure.

Although reasonable suspicion is a lesser standard than probable cause, the Fourth Circuit has repeatedly admonished the Government that it "must do more than simply label a behavior as 'suspicious' to make it so," and unequivocally held that "the Government cannot rely upon post hoc rationalizations to validate those seizures that happen to turn up contraband." United States v.

---

[6] The CI testified that he informed Det. Clark only that Jeter was exiting the Kenwood Street residence and did not claim that he shared the details of any conversations between him and Jeter occurring after Jeter's seizure for an alleged marijuana offense.

[7] Like virtually all other critical evidence in this case, the recordings of the conversations between officers on the scene were not recorded.

Foster, 634 F.3d 243, 248-49 (4th Cir. 2011); see Black, 707 F.3d at 531; United States v. Powell, 666 F.3d 180 (4th Cir. 2011); United States v. Massenburg, 654 F.3d 480, 489 (4th Cir. 2011); and United States v. Digiovanni, 650 F.3d 498 (4th Cir. 2011). Here, excising "post hoc" rationalizations and observations (including the purported throwing of a firearm *after* Jeter was seized) the only basis for Mr. Jeter's seizure is the unreliable "tip" of an informant who was repeatedly discredited by two failed promises to deliver a firearm and the observations of Det. Hill who purportedly saw Mr. Jeter walk up and down the street before entering, then exiting, the Kenwood address, a home Det. Clark knew he had a right to visit and one where he might just as likely be visiting his mother or engaging in other lawful pursuits.[8] Officers saw no weapons, narcotics, or other indicia of criminal activity prior to Mr. Jeter's seizure. His arrest was unlawful under the less exhaustive reasonable suspicion standard.

Much focus was placed on the events happening *after* Mr. Jeter's seizure, namely the purported disposal of a firearm into the back seat of the car. Indeed, the government tried to center the Court's focus on Sgt. Davis' testimony and argued that Mr. Jeter "abandoned" the firearm and thus cannot argue that he was unlawfully seized. Response, 7-8. However, "a person does not voluntarily abandon property when the abandonment results from police misconduct . . . ." United States v. Leshuk, 65 F.3d 1105, 1111 (4th Cir. 1995) (citing United States v. Lara, 638 F.2d 892, 895 (5th Cir.1981) ("If the police acted illegally in their initial encounter with Lara, then it is clear that the subsequent searches of his person and of his tote bag were all prompted by information gathered during such illegal activity."). Here, uncontraverted testimony by all witnesses established that any relinquishment of the handgun occurred after the unlawful seizure of Mr. Jeter. The CI stated Mr. Jeter dropped the gun after police had come close to the car – well after Mr. Jeter's seizure. Det. Clark and Sgt. Davis claimed they saw Mr. Jeter tossing an object after they exited their vehicle and thus well after Mr. Jeter's seizure. The evidence should be suppressed.

I remain troubled by the significant discrepancies in the testimony offered at Friday's hearing. I also believe that a defendant should not have to proceed to a motions hearing to learn the types of details concerning his prosecution that Mr. Jeter learned for the first time Friday. But the Court need not rest an order suppressing evidence on these points. Instead, the testimony

---

[8] There may be a claim that officers relied on Mr. Jeter's criminal record, though it is unclear if Det. Clark knew the details of Mr. Jeter's record (beyond the mere fact that he had one) before he seized him on October 23rd. I recall that Det. Clark could not remember any of the details of the CI's record, thus the same is likely true of Mr. Jeter's. Without additional facts, Mr. Jeter's record is of little moment to the finding of reasonable suspicion and, in any event, "[a] prior criminal record, is not, standing alone, sufficient to create reasonable suspicion." United States v. Sprinkle, 106 F.3d 613 (4th Cir. 1997). There was also no claim at the hearing (beyond a notation in the discredited police report/statement of probable cause) that the unit block of North Kenwood is a "high crime area," thus no reliance can be placed on this unverified claim.

established that all witnesses aver that Mr. Jeter was seized *before* officers saw a firearm. That seizure was not supported by probable cause or reasonable suspicion and the recovery of the weapon was a direct result of that seizure. Thus, suppression of the evidence seized pursuant to the unlawful seizure is mandated.

I appreciate the opportunity to provide this supplement and thank the Court for its time and attention.

Sincerely,

/s/
Brendan A. Hurson
Assistant Federal Public Defender

cc: AUSA Matthew Hoff (via ECF)