```
                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF MARYLAND
                             NORTHERN DIVISION



     UNITED STATES OF AMERICA

           v.                            CRIMINAL CASE NO.
                                          CCB-14-0121
     ARTHUR JETER,

              Defendant
     _____/



                         (Motions Hearing)
                    Friday, September 19, 2014
                       Baltimore, Maryland



     Before:  Honorable Catherine C. Blake, Judge




     Appearances:

             On Behalf of the Government:
              Matthew K. Hoff, Esquire
              James Wallner, Esquire

             On Behalf of the Defendant:
              Brendan A. Hurson, Esquire





     Reported by:
     Mary M. Zajac, RPR, FCRR
     Fourth Floor, U.S. Courthouse
     101 West Lombard Street
     Baltimore, Maryland 21201
```

1          (Proceedings at 9:43 a.m.)

2          MR. HOFF:  Calling United States versus Arthur Jeter,

3   Criminal Docket Number CCB-14-0121.  Matthew Hoff, Special

4   Assistant United States Attorney, on behalf of the government.

5   To my left is James Wallner, Assistant United States Attorney.

6   And to the left of him is Michael Glenn of the Baltimore Police

7   Department, Your Honor.

8          THE COURT:  All right.  Thank you.

9          MR. HURSON:  Good morning, Your Honor.  Brendan Hurson

10  on behalf of Mr. Jeter.  And I'm joined by my investigator, Mr.

11  Kanwisher.

12         THE COURT:  All right.  Thank you all very much.  So

13  we're continuing the hearing on Motions to Suppress.  I believe

14  the government's calling another witness?

15         MR. HOFF:  Yes, Your Honor.  Call Detective Mike Glenn.

16         THE COURT:  All right.

17      DETECTIVE MICHAEL GLENN, GOVERNMENT'S WITNESS, SWORN

18         THE WITNESS:  I do, ma'am.

19         THE CLERK:  Please be seated.  Please speak directly

20  into the microphone.  State your full name for the record and

21  spell your last name, please.

22         THE WITNESS:  Yes, ma'am.  My name is Michael Darin

23  Glenn.  Last name is spelled G-L-E-N-N, just like the astronaut.

24         THE COURT REPORTER:  Could you spell your middle name,

25  please?

1          THE WITNESS:  D-A-R-I-N, ma'am.

2          MR. HOFF:  May I, Your Honor?

3          THE COURT:  Go ahead.

4          DIRECT EXAMINATION

5     BY MR. HOFF:

6     Q     Detective Glenn, are you the task force officer assigned to

7     the case involving Mr. Arthur Jeter?

8     A     I am, sir.

9     Q     And did there come a point in time in relation to this case

10    that you went to the Baltimore City Detention Center?

11    A     Yes, sir.

12    Q     And why did you do that?

13    A     To ascertain if Mr. Jeter had a cell phone in his property.

14    Q     And why did you believe there may be a cell phone in Mr.

15    Jeter's property?

16    A     I checked the Baltimore City Police Evidence Control

17    Section, found that there was no cell phone submitted by the

18    detectives in this case.  My next course of action was to respond

19    to the Baltimore City Detention Center to see if Mr. Jeter had

20    his cell phone in his property.

21    Q     When was that?

22    A     That was on February 20th, 2014.

23    Q     And what, if anything, happened when you were there?

24    A     I spoke to a lieutenant there briefly and asked if I could

25    ascertain what property Mr. Jeter had.

1   Q    Did you receive a response?

2   A    I did.

3   Q    What was that?

4   A    At this time this institution is under severe scrutiny, and

5   that we are not giving out any information unless there was a

6   court document or a subpoena to get that information.

7   Q    And what did you do in response to that?

8   A    I contacted you, sir.

9   Q    What, if anything, happened after that?

10  A    A subpoena was issued for any and all property for Mr.

11  Arthur Jeter to the Baltimore City Detention Center.

12  Q    Do you know what date that was?

13  A    That was the same day, February 20th.

14  Q    In the past, have you been able to obtain information from

15  Baltimore City Detention Center in reference to property?

16  A    Yes, sir, I have.

17  Q    And how have you, how have you obtained that information?

18  A    Usually, I just, I can basically make a phone call and call

19  over and obtain the property listing, at least a listing of what

20  the property is.

21  Q    And did you make that phone call in this case?

22  A    I did not.

23  Q    Could you have made that phone call in this case?

24  A    I could have.  I don't know what the outcome would have

25  been.  But I could have continued to make a phone call.

1    Q    Did the subpoena have a compliance date?

2    A    Yes, sir.  The compliance date was March 6, 2014.

3    Q    And do you know when the defendant was indicted?

4    A    Mr. Jeter was indicted on March 13th, 2014, sir.

5    Q    Did there come a point in time when you went back to the

6    Baltimore City Detention Center?

7    A    Yes, sir.

8    Q    When was that?

9    A    That was May 28th, sir.

10   Q    Why did you go back?

11   A    I received information that, on the 22nd of May, that the

12   property would be available to be picked up on the 28th, of 2014;

13   that Mr. Shields, from Baltimore City Detention Center, would

14   have that property available for me in lieu of the grand jury

15   subpoena.

16   Q    And did you go back to BCDC on February the 28th of 2014?

17   A    I did, sir.

18   Q    And what happened?

19   A    Mr. Shields, who the property has to be released by, was

20   attending a funeral.

21   Q    So were you able to obtain it then?

22   A    I was not, sir.

23   Q    And what did you do then?

24   A    I went back on the morning of the 29th, sir.

25   Q    Were you able to retrieve anything at that time?

1    A    Yes, sir.  Received the property from Arthur Jeter.

2    Q    Why did you go back to retrieve the property?

3    A    To see if Mr. Jeter had a cell phone in that property.

4    Q    What was your intent?

5    A    If he had a cell phone, obtain a search and seizure warrant

6    for that cell phone.

7    Q    And what did you do with the property when you retrieved it

8    from BCDC?

9    A    I responded back to my office, opened the property up and

10   photographed it, and then placed it in ATF evidence.

11   Q    When you say "opened the property up", what do you mean?

12   A    It was a property bag, and it was closed.

13   Q    After you took photographs of it, did you, what did you do

14   with it?

15   A    Placed it in ATF Property.

16   Q    Did you, was there a cell phone in there?

17   A    It was.

18   Q    Did you turn on the cell phone?

19   A    I did not, sir.

20   Q    Did you use the cell phone?

21   A    I did not, sir.

22   Q    Did there come a point in time when you went back to the ATF

23   evidence a second time?

24   A    Yes, sir.

25   Q    And when was that?

1    A    I believe it was June 18th, sir.

2    Q    Of 2014?

3    A    2014, yes, sir.

4    Q    And why did you go back?

5    A    To obtain information to obtain a search warrant for the

6    cell phone.

7    Q    When you say "obtain information", what do you mean?

8    A    Obtain information regarding the cell phone:  The color, the

9    name brand, the serial number, and so forth and so on, sir.

10   Q    When you went back -- to obtain that information, did you

11   need to turn on the phone?

12   A    No, sir.

13   Q    Did you need to use the phone?

14   A    No, sir.

15   Q    After you obtained that information, what did you do?

16   A    I obtained a search and seizure warrant.  Basically wrote a

17   search and seizure warrant up for that information, for that

18   specific, for that phone.

19   Q    And what date was that?

20   A    The search and seizure warrant was obtained on the 23rd,

21   sir.

22   Q    Was the search and seizure warrant executed?

23   A    Yes, sir.  The search and seizure warrant was executed on

24   the 23rd -- sorry.  Obtained the search and seizure on the 23rd

25   of June.  It was executed on the 24th of June.

1    Q    And throughout this process, was it always your intent to

2    obtain a search and seizure warrant for that phone?

3    A    Yes, sir.  If there was a phone in there, I was going to

4    obtain a search and seizure warrant for it.

5    Q    As far as the execution of the search and seizure warrant,

6    who did that?

7    A    It's an ATF agent, Troy -- I can't pronounce his last name.

8    Cafal -- I'm sorry.

9    Q    Troy Dannenfelser, sir?

10   A    Dannenfelser.  Yes, sir.

11   Q    Why did he execute this search and seizure warrant?

12   A    He has technical experience and he has the ability to

13   retrieve the information from a cell phone.

14   Q    May I have the Court's indulgence, Your Honor?

15            (Pause in proceedings.)

16   Q    So throughout the time when the cell phone came into your

17   possession, from the time the, from, to the time that the warrant

18   was executed, was the cell phone ever utilized or turned on?

19   A    No, sir.

20   Q    Was it ever, did you ever look through the phone at any

21   point in time?

22   A    No, sir.

23   Q    I have no further questions, Your Honor.

24            THE COURT:  Thank you.  Mr. Hurson.

25            CROSS EXAMINATION

1    BY MR. HURSON:

2    Q    Thank you, Your Honor.  Detective -- is it Detective?

3    A    Yes, sir.  It's Detective.

4    Q    Detective Glenn, you said you called February 20th, 2014,

5    you called BCDC?

6    A    No, sir, I did not call BCDC.

7    Q    Okay.  I'm sorry.  You went there?

8    A    I responded to Baltimore City Detention Center.  Walked into

9    the, actually, Baltimore City Detention Center Central Booking

10   Intake Facility, part of Baltimore City Detention Center.  Walked

11   in and spoke to the lieutenant behind the desk.

12   Q    You said -- I'm confused.  You said "responded."  Nobody

13   from there called you.  You just went over there?

14   A    Yes, sir.  I went to the Central Booking Intake Facility

15   down in Baltimore.

16   Q    And to be clear, nobody would give you any information about

17   what property was in their possession that may have belonged to

18   Mr. Jeter, correct?

19   A    That's correct, sir.  The lieutenant behind the desk stated

20   she would not give me the property, or a listing of what he had.

21   Q    Did you write the grand jury subpoena in this case?

22   A    I did not, sir.

23   Q    Do you know who did?

24   A    I do, sir.

25   Q    Who was it?

1    A    Mr. Hoff, sir.

2    Q    Okay.  Did you tell him what to write?

3    A    No, sir.

4    Q    The name on the grand jury subpoena is a specific

5    individual, correct?

6    A    That's correct, sir.

7    Q    And is that, did you ever talk to that person?

8    A    I have not talked to him, no, sir.

9    Q    Okay.  So that was not the person who called you from the

10   jail to tell you that the property was ready to be picked up in,

11   I think you said, May?

12   A    Yes, sir.  Actually, Mr. Hoff contacted me, along with Mr.

13   Shields, who was a correspondent.  Mr. Shields was the one who

14   contacted me saying that the property was ready for pickup.

15   Q    The search warrant affidavit that you signed, you did type

16   that, correct?

17   A    Yes, sir.

18   Q    And you don't have a copy of that with you right now, do

19   you?

20   A    I don't, sir.

21   Q    I'm going to ask you a few questions about it.  Would it

22   help you if you had a copy of it?

23              MR. HOFF:  Objection, Your Honor.

24              THE COURT:  Why?

25              MR. HOFF:  Well, Your Honor, at this point, as far as

1    getting into the warrant, I don't think that's a focus of this

2    particular motion at this time.  I think that the --

3           THE COURT:  Well, let's see what the questions are.

4    And go ahead, if you would, Mr. Hurson, give him a copy.

5           MR. HURSON:  I'm going to approach.  I have some

6    exhibits for my own witness, Your Honor.  They go up to 20.  So

7    I'm going to call this 21, for identification only.

8           THE COURT:  Okay.

9    BY MR. HURSON:

10   Q    For the record, I think a copy of the search warrant's

11   already in the court record as an attachment to one of the

12   filings.

13          Is that -- in front of you, that's the search warrant

14   affidavit that you completed and a copy of the warrant, correct?

15   A    Yes, sir.

16   Q    The warrant itself makes reference to a model of telephone.

17   How did you find out what the model of the telephone was?

18   A    Once I obtained the property from BCDC, opened up the

19   property bag, got the model of the telephone.

20   Q    And how did you determine the make of the telephone?

21   A    The make was on the outside of the phone, sir.

22   Q    And there's an FCC ID number referenced in your warrant

23   application and in the warrant.  How did you obtain that?

24   A    By observing the phone, sir.  Just looking at the phone.

25   Q    And you actually had to take the battery off for that,

1    correct?

2    A    I believe so, sir.

3    Q    And the same is true with the ME ID number?

4    A    Yes, sir.

5    Q    What is that?

6    A    It's one of the numbers on the, on that little silver card

7    on the back where the battery's located.  Underneath the battery,

8    sir.

9    Q    So you actually had to take the phone apart and take the

10   battery off in order to get that number, correct?

11   A    Yes, sir.

12   Q    And you, as the task force officer in this case, are aware

13   of when individuals testified before the grand jury, correct?

14   A    Yes, sir.

15   Q    And so you know that the confidential informant in this case

16   testified in December of 2013, correct?

17   A    Yes, sir.

18   Q    And you're aware of the sum and substance of his testimony,

19   correct?

20   A    I wasn't inside the grand jury when he testified, sir.

21   Q    Of course not.  But you certainly met with him before his

22   testimony, right?

23   A    Yes, sir.

24   Q    So you knew that a cell phone may have been involved in this

25   case in December, correct?

1    A    Yes, sir.

2    Q    And when I say a cell phone may have been involved, that

3    there may have been communications between the CS and Mr. Jeter.

4    You knew that in December of 2013?

5    A    Yes, sir.

6    Q    And, in fact, you are aware that a grand jury subpoena for

7    the cell phone records of the CS was executed in December of

8    2013, correct?

9    A    Yes, sir.

10   Q    And you actually got those records back in December of 2013,

11   correct?

12   A    Yes, sir.

13   Q    And was it your responsibility to serve the subpoena for Mr.

14   Jeter's property at BCDC?

15   A    On some occasions, sir, I can serve it, or it's been

16   practice where the U.S. Attorney's Office can send a fax over as

17   well.

18   Q    So the subpoena was actually faxed.  Do you know how the

19   subpoena in this case was served?

20   A    It was faxed to the Baltimore City Detention Center, sir.

21   Q    Okay.  And did you send that fax?

22   A    I did not.

23   Q    Do you know who did?

24   A    Mr. Hoff did.

25   Q    And at any point did you call the Detention Center and ask

1    for a follow-up on where they were with complying with the

2    subpoena?

3    A    I did not, sir.

4    Q    No further questions, Your Honor.

5              THE COURT:  Any redirect?

6              MR. HOFF:  No, Your Honor.  No redirect.

7              THE COURT:  Thank you very much.  You can step down.

8              THE WITNESS:  Thank you, Your Honor.

9              MR. HURSON:  Your Honor, this is already, I think -- I

10   can move it into evidence or the Court can use it as attachment.

11   Ever whichever is easier.  I think it's an attachment to the

12   file.

13             THE COURT:  I think it's already in.  That's fine.

14             MR. HURSON:  Okay.

15             THE COURT:  Any other evidence on the government's

16   side?

17             MR. HOFF:  No, Your Honor.

18             THE COURT:  Mr. Hurson?

19             MR. HURSON:  Your Honor, I'm going to call Mr.

20   Kanwisher.

21             THE COURT:  All right.

22             MR. HOFF:  Your Honor, just before Mr. Kanwisher

23   testifies, the government would object on the record.  At the

24   prior motions hearing, Mr. Hurson asked if Mr. Kanwisher could

25   sit at the trial table, indicating that he was not going to be a

1    witness in these motions hearings.  He's had the benefit of

2    sitting at the trial table and hearing all the testimony and now

3    he is going to be testifying, I guess in, I guess rebuttal to the

4    testimony that was provided previously.  That would be the

5    objection by the state, or by the government.  Apologize, Your

6    Honor.

7         THE COURT:  Well, since at the time that representation

8    was made at the initial motions hearing, it apparently was not

9    your plan, and indeed you did not call TFO Glenn, to the stand.

10   This came about much more recently.  So I certainly wouldn't bind

11   the defense to that initial representation.

12        And in any event, Mr. Kanwisher's a professional

13   investigator.  It's sort of like having your case agent here.

14   I'm not declaring that as a policy for future cases, but I

15   certainly don't think there's a reason to keep him from

16   testifying.  Under these circumstances.

17        MR. HOFF:  I understand, Your Honor.  I think the basis

18   of the testimony is not related to Detective Glenn's testimony.

19   I think it's in relation to the prior testimony from all the

20   police officers and Mr. Martin.  That would be the reason for the

21   objection, Your Honor.

22        MR. HURSON:  That is absolutely correct.  I want to

23   make it clear what he's going to testify to.  And I'll just

24   proffer it.

25        THE COURT:  Go ahead.

1           MR. HURSON:  On Wednesday -- and it's true.  Based on

2    the testimony that was heard last week, Mr. Kanwisher and I and

3    another investigator went out and took some film from the scene,

4    pictures from the scene to help Your Honor in deciding the

5    motion.  It's absolutely true that the information that was

6    learned at the motions hearing was a significant part of the

7    basis for what we did.  Specifically, we stood in the places

8    where witnesses said they stood.  We filmed from the perspective

9    of witnesses.  We actually reenacted some of the events that were

10   testified to.  And I completely agree, we wouldn't have known

11   that before.

12           But I think it's important to note that one of the

13   reasons we wouldn't have known that before is because the police

14   report in the case was written in a manner which was intended to

15   hide, for whatever purpose, good or bad, the facts of the case.

16   There were no police reports written.  There was nothing

17   preserved.

18           I would say that, ordinarily, the practice would be

19   that I would relay that information to an investigator who was

20   not present.  And then they would come in and say, Did you have a

21   conversation with me?  Yes.  Did I tell you this?  So I don't

22   know that there's any sort of unfair advantage.  If anything, it

23   actually makes it that much clearer because Mr. Kanwisher and I

24   were able to specifically reenact precisely what the officers

25   said happened.

1        We did it, as I'll ask Mr. Kanwisher, because we think

2   it might be helpful to you to know and see the area in a manner

3   that's different than just an aerial map from Google Maps.  If

4   it's not, you're certainly free to disregard all of it.

5        What we have is about 20 minutes of pictures from the

6   various perspectives of the individuals involved.  And we have

7   some video that is both the perspective of Detective Hill from

8   her vantage point at the corner of Fairmont and Kenwood.  We also

9   have a reenactment of exiting Number Seven, going to where the

10  vehicle of Mr. Martin was supposedly parked, as well as a

11  reenactment of driving from Streeper Street to the area where the

12  officers testified they stopped the car, or pulled up behind the

13  car.

14        And it's based on the testimony.  Of course, the Court

15  can give it whatever weight it wants to.

16        I don't intend to play the whole video.  I was going

17  to, I was just going to submit it to Your Honor.  It's about

18  eight minutes long.  And we have about 20, maybe 15 pictures or

19  so.

20        We also found a Mercury Mark VIII of the same year and

21  model, because I know there was a lot of testimony about what the

22  car looked like and where people were.  We actually found one.

23  And Mr. Kanwisher was able to go out and take a look at it and

24  take some pictures.  We just thought it might be helpful.  He's

25  not --

1          THE COURT:  I see.

2          MR. HURSON:  -- testifying to anything other than that.

3          THE COURT:  Well, just a few comments first.  But it

4     obviously would have been helpful for me to know in advance what

5     he was going to testify about, that there was more to it.  I

6     assumed, as you just gathered from my comments, that it related

7     to the inevitable discovery issue.

8          Having said that, I also think this is a fairly unusual

9     case.  And I do recall from the last motions hearing that I think

10    defense counsel reasonably indicated that he was surprised.

11    Learned a lot of information at the motions hearing that had not

12    previously been disclosed.  Again, I'm not saying that's good or

13    bad.  And we heard why the affidavit was written the way it was

14    written.

15         So given the seriousness of the case and these

16    particular circumstances, I'm going to let you present the

17    evidence.  Whether or not it turns out to be helpful is another

18    question.  And I'll certainly keep in mind Mr. Hoff's point, that

19    Mr. Kanwisher obviously was sitting here, listening to the

20    testimony when we were here before.

21         MR. HURSON:  I apologize.  When we were on the

22    conference call, you said I could present new evidence.  I took

23    that to mean writ large.  I'm sorry.  That's my fault.

24         THE COURT:  I meant in response to whatever the

25    government might be putting on today.  But go ahead.  Let's get

1    the pictures into evidence.

2              MR. HURSON:  Great.

3              WILLIAM KANWISHER, DEFENDANT'S WITNESS, SWORN

4              THE WITNESS:  I do.

5              THE CLERK:  Please be seated.  Please speak directly

6    into the microphone.  State your full name for the record and

7    spell your last name, please.

8              THE WITNESS:  Yes, ma'am.  William Walter Kanwisher.

9    Last name is K-A-N-W-I-S-H-E-R.

10             THE CLERK:  Thank you.

11             DIRECT EXAMINATION

12   BY MR. HURSON:

13   Q    Mr. Kanwisher, where are you employed?

14   A    Federal Public Defender's Office.

15   Q    And how long have you worked there?

16   A    Worked there nine years.

17   Q    And are you assigned to the Arthur Jeter case?

18   A    Yes.  I am the assigned staff investigator to that case.

19   Q    And you were in court on, last week, during a motions

20   hearing in this case, correct?

21   A    I was in court last Friday for the motions hearing, correct.

22   Q    And after that motions hearing, we went out to Kenwood

23   Street (sic), right?

24   A    We did.  We went out last Wednesday, and I believe the day

25   was September 17th.

1    Q    So why did we, why did you do that?

2    A    Well, we had learned a lot of information last Friday,

3    particularly and most importantly about the placement of

4    individuals, their observations, the timing, the circumstances.

5    And we had not had that information prior to that and were unable

6    to investigate it.  So we believe -- first of all, we wanted to

7    educate ourselves as to those particular issues.  But as we got

8    out there, we realized that there may be a chance to be helpful

9    to the Court in terms of producing some exhibits that may give

10   some context to the testimony that was heard last Wednesday, or

11   last Friday.

12   Q    And what day -- you keep saying "we."  Who went with you?

13   A    You were there.  And another staff investigator, Joseph

14   Segreti, was also there.

15   Q    And what day did we go?

16   A    I think it was last Wednesday, two days ago.

17   Q    And why did we go on a Wednesday?

18   A    Well, as we found out when we looked into it, the October

19   23rd, 2013 date was also a Wednesday.  We're also approximately

20   in the same season.  We're about a little more than a month away

21   from October 23rd.  So the conditions, we wanted to approximate

22   as close as we could the conditions that were occurring on

23   October 23rd, 2013.

24   Q    And what time did we go?

25   A    Again, our understanding was that the events took place

1   basically between noon and two.  We went out there -- the most

2   important events seemed to take place between one and two.  We

3   arrived probably a little before one and we were finished

4   sometime after 1:30.

5   Q    I show you what's previously been marked as Defendant's

6   Exhibit 6.  Do you recognize this?

7   A    Yes.  It's an aerial view of the North Kenwood Avenue area,

8   the unit block.  Also shows Baltimore Street, Fairmount, Belnord,

9   and Streeper as well.

10  Q    And you remember the testimony of Detective Hill, correct?

11  A    Yes, I do.

12  Q    And were you able to find, to stand in the approximate

13  location that Detective Hill said she was standing in on October

14  the 23rd, when she made observations of Mr. Jeter and Mr. Martin?

15  A    That's correct.  I was able to approximate where it was.

16  She had described an angle-in parking right, as I understood it,

17  below the crosswalk below, actually, that would be north of

18  Fairmount, actually parked on Kenwood.

19  Q    Okay.  I'm going to show you -- can you mark on the screen

20  where that was that you stood?

21  A    About right there (indicating).

22  Q    Okay.  I'm showing you Defendant's Exhibit Seven.  What is

23  this?

24  A    It's a photograph that was taken Wednesday.  It's a

25  photograph from Seven North Kenwood.  This would be looking

1    north, towards the spot where Officer Hill had been or had

2    testified to be on October 23rd, 2013.

3    Q    I'm showing you Defendant's Exhibit Eight.  What's that?

4    A    It's a very similar photograph, standing, again, on the

5    steps of Seven North Kenwood, looking north towards Fairmount.

6    Q    And now I'm showing you Defendant's Exhibit Number Nine.

7    What is that?

8    A    This is a view from Kenwood and Fairmount.  The cross street

9    that you can see there is Fairmount.  The angle is looking south

10   towards Seven North Kenwood.

11   Q    Now, were you able to make any observations about where

12   number Seven North Kenwood is on that block?

13   A    Yes.  There's an alley there.  And if you go four houses

14   north, that would be Seven North Kenwood.

15        THE COURT:  Where on this picture, which is, what?

16   Defendant's Exhibit Nine?

17        THE WITNESS:  I'm sorry, Your Honor?

18        THE COURT:  On this picture.

19   BY MR. HURSON:

20   Q    I'm actually going to approach with Exhibit Number Nine.

21   Can you mark on Exhibit Number Nine approximately where Number

22   Seven is?  You can do an arrow.

23   A    It's a little difficult because of the foliage and the cars.

24   But I can try to approximate it with an arrow.

25   Q    Here's Defendant's Six, if this is helpful.

1    A    Yes.  I think that might be the better view.  So from the

2    alley, counting one, two, three, four, it would be about right

3    there (indicating).

4    Q    Are you able to make a mark?

5    A    I can, but it's not very legible, I have to say.  I'm not

6    sure it's as precise as the Court would like.  I think the aerial

7    photo might be better.

8    Q    Here's Defendant's Six.  Showing where Number Seven is?

9         THE COURT:  And what is it that's indicating Number

10   Seven?

11   Q    This black or, these two lines here.

12   A    Also, Your Honor, you see the red icon, guess I would call

13   it there.

14        THE COURT:  Yes.

15        THE WITNESS:  That is right where it is.

16        THE COURT:  Okay.  By the red icon.

17   BY MR. HURSON:

18   Q    Mr. Kanwisher, Number Nine you made a mark here.  That's

19   pointing approximately where Number Seven is, is that correct?

20   A    It's approximate.  It's very hard to see through the

21   foliage.  But it's, yeah, it's, that's approximately where it is.

22        THE COURT:  The mark, again, perhaps I could see the --

23        MR. HURSON:  I'll bring up the original, Your Honor, if

24   you'd like.

25        THE COURT:  Thank you.  All right.  Thank you.

1    BY MR. HURSON:

2    Q    I left off on number, I think it was Number 10.  This is

3    Defendant's Exhibit 10.  And what's this, Mr. Kanwisher?

4    A    This is a photograph depicting the view from the corner of

5    Kenwood and Fairmount, again looking north towards Seven North

6    Kenwood.  This is the approximate position, as I understood it,

7    that Officer Hill described her observation point to be.

8    Q    This is --

9         THE COURT:  Okay.  I'm confused.  We're now supposedly

10   where Officer Hill was.  We're looking south or north?

11        MR. HURSON:  I think he actually said north, Your

12   Honor.  He meant to say -- I'm sorry.  Mr. Kanwisher --

13        THE WITNESS:  I'm sorry.  Yes, that was my mistake.

14   We're looking south.

15        THE COURT:  South.  Okay.  Number Nine.  Okay.

16        THE WITNESS:  Yes.  Thank you for catching that.

17   BY MR. HURSON:

18   Q    It may be helpful zooming in a little bit.  You can actually

19   see the -- can you see the change in row houses in the --

20   A    I'm not trying to be difficult, but if you count down one,

21   two, three, four, it's about as far as I'm counting, I think

22   that's right.  One, two, three four.  It's the fourth house down

23   from the alley.  I think that's it.

24   Q    Okay.  This is very similar.  This is Defendant's 11.

25   What's this?

1    A    It's a very similar view.  You're at Kenwood and Fairmount,

2    again looking -- make sure I'm right -- south towards Seven North

3    Kenwood.

4    Q    Now, there was, was there a time when you actually went and

5    stood on the steps of Seven North Kenwood?

6    A    Yes, sir.

7    Q    And where was I when you stood on the steps of Seven North

8    Kenwood?

9    A    Well, you were in the area.  I can't remember exactly where.

10   But there was -- are you speaking of our attempts to recreate

11   certain aspects?

12   Q    Yeah.  I'm show you Defendant's 12.

13   A    Yes.

14   Q    And who took Defendant's 12?

15   A    I believe that's your photograph.

16   Q    And where are you in this picture?

17   A    I am -- yeah, please.  I think I'm on the steps.  It's hard

18   to see.

19   Q    Do you remember --

20   A    I remember being there, yeah.

21   Q    -- being on the steps of Seven North Kenwood?

22   A    Yes.  Yes, absolutely.

23   Q    Like you said, I took this picture, correct?

24   A    Yes.

25   Q    But this accurately reflects the area on Wednesday, correct?

1    A    Yes, it does.

2    Q    And were you able to make any measurements in between the

3    spot that Detective Hill was standing and the steps of North

4    Kenwood?

5    A    Yes.  This is what I did, Your Honor.  I had a measuring

6    wheel.  And I started at Seven North Kenwood and I walked in as

7    direct a way as I could to the spot where I understood Officer

8    Hill to have been observing.  And I went down there all the way

9    to that spot, which was just a little bit beyond the crosswalk

10   that's depicted in the photographs.  And then I turned the wheel

11   around and recalibrated it to zero and walked back again to the

12   steps at Seven North Kenwood.

13   Q    And what was the distance that you, the wheel indicated

14   between number Seven North Kenwood's steps and the location that

15   Detective Hill said she was in?

16   A    The wheel isn't the most precise instrument.  So the first

17   time down, when I was walking towards Officer Hill, was 280 feet.

18   And then coming back the other direction was 284 feet.

19   Q    Can you switch to the computer terminal?  Mr. Kanwisher, I'm

20   showing you the beginning of Defendant's 20?

21   A    Yes, sir.

22   Q    And did you take some video when you were out there on

23   Wednesday?

24   A    Yes, I did.

25   Q    And I took some, too, correct?

1   A    You did.

2   Q    One of the videos you took was you walking from the steps to

3   where Detective Hill was located, correct?

4   A    Right.  That was -- yes.  And that was just me pacing the

5   distance.  This is before I had actually used the wheel.  So this

6   was just myself holding a video camera at eye level and walking

7   to the spot and then walking back.

8   Q    And that's what is at the beginning of Defendant's Exhibit

9   20, is that correct?

10  A    Yes, I think so.

11  Q    As the video's playing, do you remember how many trees you

12  remember counting between Exhibit Seven and the spot Detective

13  Hill was in?

14  A    Well, I believe it was, it was six.  It may have been as

15  many as eight.  Actually, we can count them together.  One, two,

16  three, four, five, -- certainly five.  And there may have been

17  more.  But the video speaks for itself.  It shows you the degree

18  and the amount of foliage that existed.

19          MR. WALLNER:  Objection, Your Honor.  Can we stop the

20  editorializing?

21          THE COURT:  Shows the degree and amount of foliage?

22  BY MR. HURSON:

23  Q    And you're coming up on what in the video, Mr. Kanwisher?

24  A    Coming up on the corner of Kenwood and Fairmount.  Fairmount

25  is the cross street.  I think there might be some traffic here.

1    I'm not sure.  Yep.

2            And then my understanding was that Officer Hill was

3    parked just beyond the crosswalk, so right there.  So I got to

4    the crosswalk, took a couple of steps forward, and then just

5    reversed.

6    Q    Okay.  To be clear, you also brought binoculars with you,

7    right?

8    A    Yes.  Correct.

9    Q    And do you remember the magnification power of binoculars?

10   A    I believe it was a 7 times 50 power.

11   Q    And when you used -- you used the binoculars from the point

12   of view where Detective Hill was, correct?

13   A    I did.

14   Q    And you aimed the binoculars at Number Seven, right?

15   A    I did.

16   Q    And what could you see as far as the steps of Number Seven?

17   A    Well, Your Honor, the problem was the obstructions.  And

18   between the cars and mostly the trees, it was difficult to even

19   see it at all, notwithstanding.  Now I could move around.  The

20   testimony of Officer Hill was that she moved from the driver to

21   the passenger seat.  So I assume that that was the extent of her

22   movement.

23           In an attempt to try and see more clearly with the

24   binoculars, I actually probably did more motion than she

25   described, to try and get the best view I could.  And it was

1    difficult to see, mostly because of the obstruction.

2          Now, if you had taken the obstruction away, I don't

3    know what I would have been able to see because you can't really,

4    it's an imagination trick to try and do that.  But that was the

5    problem, is I couldn't.  So I don't know what I could have seen,

6    to be honest with you.  All I could see is trees and leaves.

7    Q    But we also tried to look at -- we parked a vehicle in the

8    street at the south end of Kenwood, correct?

9    A    Um-hum.

10   Q    And when you looked through the binoculars, could you see

11   the vehicle?

12   A    From the south end of Kenwood?

13   Q    You're at the north end of Kenwood, where Detective Hill

14   was.  My question is, could you see with binoculars the vehicle

15   parked in the approximate location?

16   A    Yes.

17   Q    You could see it?

18   A    If your question is could I see the vehicle, the answer

19   would be yes.

20   Q    Could you see clear?  I don't want to cut you off.  But to

21   be clear, the vehicle we're talking about is parked where?

22   A    Yes.  We should be clear about that.  The vehicle was parked

23   in the place that we understood where Mr. Martin's vehicle had

24   been parked, which was just south of the alley that we referred

25   to throughout the motions hearing.

1    Q    And, to be clear, you could see somebody getting in and out

2    of that car from the driver's side, correct?

3    A    Yes, definitely.

4    Q    Did you have a chance to -- going to that vehicle.  Why,

5    again, did we park the vehicle where we did?

6    A    The testimony last Friday was that the car parked by Mr.

7    Martin, the '94 Lincoln Mark VII, was in that position, which was

8    just south of the alley, that cuts through there off of North

9    Kenwood.

10   Q    Now, did we re-create people, a person coming out of Number

11   Seven and heading to that car?

12   A    Yes, we did.

13   Q    Why did we do that?

14   A    Well, there was testimony, some of it at variance, about the

15   movements of Mr. Jeter moving towards Mr. Martin's car parked

16   there, again, south of the alley.  And what we were attempting to

17   do is to try and establish, as best we could, the distance, first

18   of all, and then the time it would take to cover the distance

19   from Seven North Kenwood to the car.

20   Q    And were we able to measure the distance between Seven North

21   Kenwood and where the car was parked?

22   A    Yes, we were.

23   Q    And how far was it?

24   A    Well, not being as precise as to exactly where the car was,

25   but it was approximately 80 feet to that particular area.

1    Q    And what was the re-creation that we did with respect to the

2    lengths, distance from Seven to the car?

3    A    Well, what we wanted to do was try and figure out how long

4    it takes to cover that distance, that 80-feet distance.  So we

5    decided to try and videotape it.  Someone, as it turns out it was

6    you, running from the steps of Seven North Kenwood to the car

7    itself.  And to be, well, to attempt to be as fair as we possibly

8    could, we tried to do it at as many speeds as we could.  So

9    walking, walking fast, walking and then breaking into a run,

10   which I think at some point was testimony of one of the officers.

11   I can't recall which.  And then a flat-out sort of sprint, just

12   to, and again, hopefully to help the Court just arrange.

13          We don't know exactly how fast he was moving.  It's

14   hard to describe that kind of thing.  But we knew that he covered

15   the distance.  So we did it as fast as we could and then we did

16   it at a normal walking pace, to just find a range of time.

17   Q    Showing you Exhibit 20.  Who's that guy?

18   A    Well, shady character, but that's you.  And that's you

19   running towards the car parked in the position that we understood

20   Mr. Martin's '94 Lincoln Mark VII to be.  And these, I think we

21   took six of these, again, trying to vary pace.  That's a slow jog

22   there.

23          And we were also trying to establish how fast, once he

24   was in the car, as well.  That seemed to be an important fact.

25   This is you running about as fast, I think, as you can run.

1    Q    And how long did it take to make that run?

2    A    Well, again, we were trying to establish a range.  And the

3    fastest that we were able to do it, or you were able to do it, I

4    should say, was a little over 6 seconds.  And the slowest was a

5    little over 14 seconds.

6    Q    And that's going to the car, opening the door, and sitting

7    down, correct?

8    A    Yes.  That is correct.  Now, Your Honor should know when we

9    timed it, we tried to time it off the video.  So the video would

10   show the times.  And that's how those times were arrived at.

11   Q    Now, you also took your investigator car over to Streeper

12   Street, right?

13   A    Yes, sir.

14   Q    And why did you do that?

15   A    Well, again, based on testimony that we heard last week, we

16   were trying to establish, again, within certain ranges and

17   parameters, how long it would take to drive from approximately

18   mid-block on Streeper, up Streeper to Baltimore, turning right

19   onto Baltimore, and then turning right and pulling in behind

20   where we believed Mr. Martin's car was on North Kenwood.

21           And again, we wanted to try, we tried to do this with

22   all possibilities in mind, as fast as we could.  You know, we

23   don't know what the traffic conditions were.  We don't, we didn't

24   know, I didn't hear any testimony as to whether or not police

25   officers were actually parked at the curb or whether they were

1    just stopped, you know, mid block.

2          So we tried to do it -- the first one will be where

3    we're parked at the curb and pull out.  All the other ones are

4    with the government car in the middle of the street and then

5    pulling directly up.

6    Q    I'm showing you Exhibit 20 again.  This is what?

7    A    This is the beginning of us pulling out.  Again, we're

8    parked on the curb, the right-hand curb.  It was hard to find

9    parking spots, for one thing.  So we came up, parked, and then

10   moved.  And we're driving at a reasonable rate of speed.  We're

11   probably not driving, you know, very fast.  There is one where we

12   went as fast as we could.  But this one is at a normal rate of

13   speed.

14         And then we have to allow for traffic.  This is the

15   right turn onto Baltimore Street.  And we're coming up here onto

16   Kenwood.  And we're turning right on Kenwood.

17   Q    Now, you did a number of these, correct?

18   A    I think we did six of this as well.

19   Q    And it seems on each one you slowed down at the end of

20   Streeper Street.  Why did you slow down at the end of Streeper

21   Street?

22   A    It was two reasons.  One is traffic.  And the second is that

23   Sergeant Davis's testimony indicated -- and I think this is an

24   actual phrase that he used -- he said he eased in.  My

25   understanding of that was that he eased into traffic on Baltimore

1    Street.  And then I think his other phrase was that he pinched

2    up, which I took to mean that he pulled in directly behind Mr.

3    Martin's car.  And so -- and the Court can see now that -- this

4    is a little faster.

5             So we're, again, we're trying to find a range.  We're

6    trying to be fair because we, we weren't there.  We don't

7    understand exactly how fast they were going.  But again --

8    Q    And in timing these -- you did time these, correct?

9    A    We did.  Again, we did the same thing that we did with the,

10   the first reenactment, which is that we timed it off of the

11   videotape.

12   Q    And what was the time range that you came up with, the

13   average between Streeper Street and pulling up behind the car?

14   A    Right.  As I recall, the longest was the one where we were

15   parked.  And it took a little bit longer because we had to pull

16   out.  It took us a little bit of time.  That was 34 seconds.  A

17   little bit more than 34, I think.  The fastest we were able to do

18   it was a little over 21 seconds.

19   Q    Now, one of these -- you did another reenactment, correct,

20   involving me?

21   A    Yes.

22   Q    And --

23   A    Well, right.  Yes, we did.  Can I explain that?

24   Q    Yes, please.

25   A    What we were attempting to do, Mr. Hurson and I were in cell

1    phone contact.  And at the signal, which was given by Mr. Hurson,

2    Mr. Hurson would, started on the steps of Seven North Kenwood.

3    And he would say "Go."  At that point, we would start driving up

4    Streeper.  And Mr. Hurson would start moving towards the car,

5    what would be Mr. Martin's car.  And we would attempt to try --

6    you know, the game of it was we were trying to catch Mr. Hurson

7    outside the car and see how fast we could.  So we're moving at,

8    as fast as we could.  That was what we were trying to do, is to

9    move so fast that Mr. Hurson would be outside the car.

10   Q    And that's this video here, correct?

11   A    Yeah.  That one -- there was two, we made two tries.  That

12   was one.  That last one was one of them.

13   Q    And every time you pulled up, where was I?

14   A    You were sitting in the passenger seat of the reenactment

15   car.

16   Q    And on the videos, so the judge is clear, you say "Go, Go,

17   Go", right, if you listen to the audio, is that right?

18   A    Right.  Right.  It was trying to, we were trying to go fast.

19   Q    Before we leave, what did you observe in and around the area

20   of Seven North Kenwood on Wednesday vis-à-vis people, cars?  What

21   was the area like?

22   A    Well, yeah.  I was surprised there was a lot of pedestrian

23   traffic there.  And, obviously, the Court can see there were a

24   number of cars parked on Kenwood.  There are a number of cars

25   parked on Streeper as well.  It was hard to find a parking spot

1      on Streeper to do the reenactment we wanted to do.

2            So I was curious about that.  So I asked the postal

3      worker who just happened to be there, Cheryl Jencks.  I said, is

4      this, do you usually deliver mail at this time every day?  She

5      says, "Yes."  And I said, "Is it always like this?"  And she

6      said, "Not really.  It's like this on Wednesdays because the

7      school" -- I should have asked her the name of the school, but I

8      didn't.  But there's a school on the corner of, I think it's

9      Belnord and Fairmount.  And what she explained to me is they had

10     an early dismissal.  And as we were talking, we pulled someone in

11     who was walking by, who turned out to be a parent of a child that

12     attended that school, and she told us that the early dismissal

13     time on Wednesdays was at 1:30.

14     Q    So did you come to have a chance to examine a Mark VIII

15     vehicle?

16     A    '94 Lincoln Mark VIII, which was, as I understood, the

17     make, the year, make and model of the car that Mr. Martin was

18     driving.

19     Q    And how did you come to find a 1994 Mark VIII?

20     A    Well, first of all, the first thing we did was we ran the

21     license number at MVA and try and figure out, make sure that we

22     had the right make, year, and model.  And that was, in fact,

23     true.

24            Then the testimony from Mr. Martin was that the car

25     had, was in the impound lot.  So we went to the impound lot to

1   actually try and find the actual car.  When we got there, we were

2   told by the detective on duty that the car had been auctioned off

3   and was no longer on the lot.

4          Then we started trying to find, you know, a '94 Lincoln

5   Mark VIII.  And it said '94.  So it's a 20-year-old car.  There

6   are not many of them.  But we found one for sale through

7   cars.com.  And I called the seller of it, who was in Edgewater,

8   Maryland.  I arranged to go down there and meet him with the car.

9   We met at, maybe you can see it, the parking lot of a restaurant.

10  And I proceeded to examine the car.

11  Q    And did you take some pictures and video of that

12  examination?

13  A    Yes.

14  Q    And showing you, again, Defendant's 20.  What's this?

15  A    This is some video, I think -- yup -- it's video I took of

16  the car.  The reason I'm doing it the way I'm doing it is because

17  my understanding of the testimony of Sergeant Davis was that he

18  approached the car from the back on the driver's side and moved

19  along the quarter panel, and described seeing a sweatshirt being

20  thrown from the front to the back seat, the sweatshirt hitting

21  the back seat, and a gun falling from the sweatshirt on to the

22  floor below.

23         My reasons for going there was to see how easy or hard

24  it was to actually do that from that position.

25  Q    And you took some pictures as well?

1    A    Yes.

2    Q    I'm going to show you -- can I get the document camera back?

3    Thank you.  I'm showing you Defendant's 13.  Did you take this

4    picture?

5    A    Um-hum.  Yes, I did.

6    Q    And what is it a picture of?

7    A    It's a picture of the -- well, it's a '94 Lincoln Mark V, or

8    Mark VIII -- I'm sorry -- that was being sold or trying to be

9    sold, anyway.

10   Q    And Defendant's 14.

11   A    Yes.  I took that.  Same, same car.

12   Q    Defendant's 15.

13   A    Yes.  Same car.

14   Q    Defendant's 16?

15   A    Yes.  Well, this is a different view.  I've moved up, up the

16   quarter panel.  And I'm shooting into the car to try and really

17   memorialize what I could see.  Now, you should know that I'm

18   holding the camera at my eye level, when I'm about five-nine.

19   Q    Defendant's 17.

20   A    Same car, different view.  I've moved up maybe a step or

21   two.  And I'm looking, again, from my eye level down into the

22   car.

23   Q    And Defendant's 18.  Two more after this.

24   A    Yep.  Same, same car.  I've moved up again.  You can see,

25   you can extrapolate.  I'm probably a little bit in back of the

1    back window shooting into the car again.

2    Q    And why are you approaching on the driver's side?

3    A    That was the testimony of Sergeant Davis last Friday.

4    Q    And Defendant's 19?

5    A    Yes.  I've moved back a little bit from the last photograph.

6    But it's the same car, again trying to look into the car.

7    Q    There's 19-A.  What's that?

8    A    Right.  That's me.  Now I've moved up.  I'm about parallel

9    to the back.  It's a two-door car and it has a small back win --

10   back window's not the word I want to use.  It's a triangular

11   window for the passenger of the back seat.  And that's what you

12   see there on the right.  I'll touch it there.  And looking in

13   and, again, I'm at eye level, looking down into the car itself.

14   Q    Could you see the floor behind the passenger or driver's

15   side at any point?

16   A    Well, you can see the floor if you get right up on top of

17   the car and you're right by that triangular window, you can see

18   it.  The farther back down the quarter panel you go, the harder

19   it is to see.  The angle, one -- there's a couple reasons for

20   that.  One is the angle decreases.  It's harder to see down

21   there.  And the other thing is that the car, there's an

22   obstruction there where the roof of the car comes down and meets

23   the body.  And it's hard to see around that.

24   Q    No further questions.

25              THE COURT:  All right.  Thank you, Mr. Hurson.  Mr.

1    Hoff.

2                CROSS EXAMINATION

3    BY MR. HOFF:

4    Q    Just briefly, Your Honor.  I'm showing you Defense Exhibit

5    -- I'm sorry.  This is Number 10, correct?

6    A    Yes.

7    Q    And you took this picture?

8    A    I'm not sure.

9    Q    And there's some vehicles in the road down by where you

10   indicated Seven North Kenwood is, correct?

11   A    Up the block on Kenwood?

12   Q    Yes.

13   A    Yes.

14   Q    And Defense Exhibit Number 11.  That's essentially the same

15   angle and picture as Number 10, correct?

16   A    Yep.  Yes.

17   Q    And there's less cars in front of the area of Seven North

18   Kenwood in this picture, correct?

19   A    I think you're right.  Can you show me the first one again?

20   Yeah.  Looks like there's a car present in Exhibit 10 that wasn't

21   in the other one, whichever one it was you showed me.

22   Q    Exhibit Number 11?

23   A    Yup.  You can tell that there's one car missing that was

24   there in 10.  It's not in 11.

25   Q    And, in fact, I believe your testimony was -- there was

1    numerous mentions made to obstructions and foliage.  But I

2    believe your testimony was, with the obstructions away, you don't

3    know what you would have seen, correct?

4    A    Yeah.  That's true.

5    Q    I have no further questions, Your Honor.

6              THE COURT:  Any redirect?

7              REDIRECT EXAMINATION

8    BY MR. HURSON:

9    Q    Were the cars blocking your view of the steps of North

10   Kenwood?

11   A    No.  It was more the foliage that was blocking it.  It was

12   the foliage.

13             MR. HURSON:  No further questions.

14             THE COURT:  Okay.  You may be excused.  You can step

15   back down.  All right.

16             Mr. Hoff, in fairness, if you have anything that you

17   want to present in rebuttal to that, obviously, I'll give you

18   time to do it, now that you've, now that you've heard it.

19   Otherwise, other than that, I think we'll be closing the record

20   as far as evidence today.

21             What I talked to counsel about in our conference call

22   last Wednesday was that I thought it would be helpful to have a

23   transcript of the testimony in this particular case before I make

24   a ruling.  I still believe that.  And we talked about, for that

25   reason, and I guess perhaps because it's getting fairly close,

1   anyway, a possible postponement of the trial date.

2           Let me see if there have been any changes in the

3   calendar since we talked.  We had --

4           MR. HOFF:  Your Honor, may counsel and I approach, just

5   as far as a scheduling issue?

6           THE COURT:  Sure.

7           (Bench conference on the record.)

8           MR. HOFF:  Your Honor, I talked to Mr. Hurson this

9   morning.  And I know that we kind of discussed a tentative date

10  of December 15th.

11          THE COURT:  Yes.

12          MR. HOFF:  I guess I was a little optimistic on my part

13  probably because, I did discuss that, I am going to be out for

14  the birth of a child.

15          THE COURT:  Sure.

16          MR. HOFF:  The beginning of December is not good.  I

17  also have another trial scheduled the week before that.  So I

18  just don't think it's realistic, probably, on my part to assume

19  that I would be able to even do that.

20          So I did discuss that with Mr. Hurson.  We did discuss,

21  if possible, a date in January probably would make more sense.

22          MR. HURSON:  That's fine.  I haven't talked to Mr.

23  Jeter but he'll understand.  If anything opens up in October or

24  November, that would obviously be ideal.

25          THE COURT:  Well, maybe, in light of this, it makes

1    more sense for us to have a conference call next week.

2              MR. HURSON:  That's fine.

3              THE COURT:  And perhaps at the same time, if you want,

4    you can determine whether there's any rebuttal that you want to

5    present, and how long it will take to get the transcript, and

6    when we can set some dates, particularly if there's any

7    supplemental briefing anybody wants to do based on the

8    transcript, and talk about a trial date.

9              MR. HOFF:  Okay.  Just to be clear, the October 6th

10   date, we are not going --

11             THE COURT:  We are going to postpone the October 6th

12   date.  Yes.

13             MR. WALLNER:  I believe Mr. Hurson already requested

14   the transcript on a seven-day turnaround, so we should have that

15   before that time.

16             MR. HURSON:  Hopefully.  We ordered it.  Everyone's

17   paying for it.

18             THE COURT:  That's fine.  Presumably you'll wanted

19   today's testimony as well.

20             MR. HOFF:  Yes.

21             THE COURT:  All right.  Why don't we just have a

22   conference call?

23             MR. HURSON:  I ordered it when we were still going to

24   trial on the 6th.  I think I ordered it right after we left

25   court.

1          THE COURT:  Actually, why don't we have the conference

2    call on the morning of October 6th?  Let's say 9:30?

3          MR. HOFF:  That's fine.

4          THE COURT:  And if the government could initiate the

5    call.

6          MR. HOFF:  Certainly, Your Honor.

7          MR. HURSON:  I forgot to give Mr. Jeter an earpiece.

8    I'll tell him the substance of what we just talked about.

9          THE COURT:  Yes.  I think it's only scheduling.

10          MR. HURSON:  Just so the record's clear.

11          THE COURT:  Yes.  Thank you.  And let me know if he has

12   any difficulties with what we've just discussed.

13          MR. HURSON:  I will.  I was going to summarize some of

14   the discovery issues that came up on Friday.  I can do that here

15   or we can do that in open court.  Might be better to do it in

16   open court.

17          THE COURT:  Yes.  That's fine.

18          (End of bench conference.)

19          THE COURT:  Yes.  Just to summarize what we've just

20   said at the bench, was that we're going to have a conference call

21   the morning of October 6th, at 9:30 in the morning; that we are

22   not going to trial on October 6th.  We'll have a conference call.

23   I asked the government to initiate it.

24          During the conference call we'll discuss the status of

25   the transcript that's been ordered, what dates might be available

1    to put this in for trial, and if the government feels the

2    necessity to present any rebuttal to what the defendant presented

3    today.

4              And you had some other issues you wanted to discuss,

5    Mr. Hurson?

6              MR. HURSON:  Yes, Your Honor.  At the hearing on

7    Friday, as you pointed out earlier, a lot of new things were

8    learned.  One of them is that some phone calls were placed by the

9    confidential source and his girlfriend to the Internal Affairs

10   Division of the Baltimore City Police Department.  Those calls, I

11   tried to subpoena them before I even had anything.  They had

12   already been provided to the government, who's since provided

13   them to us.

14             THE COURT:  So you do not need a subpoena for --

15             MR. HURSON:  I don't need them for that any more.

16             THE COURT:  -- IID.

17             MR. HURSON:  I mean, I assume that we got the complete.

18   I usually trying to subpoena them, anyway, just to make sure I

19   got exactly what's there, everything that's there.  What I did

20   not get, and I don't even know if it even exists, is whether

21   there was a file opened or any sort of investigation done.  I can

22   tell Your Honor what the call contains.

23             The first call is from someone who purports to be a

24   friend of someone.  And that someone we have to assume is Mr.

25   Martin.  And what she is saying is that he was arrested, the

1    friend, without probable cause and -- in her view, again.  I'm

2    not saying --

3              THE COURT:  Sure.

4              MR. HURSON:  And what she says is that he was then told

5    he has to get a gun or he's going to get charged.  And he says --

6    she says on the tape that she was privy to a conversation.  She

7    was present when an officer called her friend and threatened him,

8    using foul language, that he has to produce or else he's going to

9    go to jail.  Can they do that?  Is that legal?  That was, in

10   essence, the first call.

11             And the officer says, you know, he's going to have to

12   call himself, and have him call back.

13             The second call that was produced is likely Mr. Martin.

14   I assume it is.  I don't know if he uses his name or not.  But he

15   says, basically, he's inquiring the same thing.  He says, I got

16   arrested yesterday.  Can they still charge me if I do what they

17   want?  She's very, I don't want to say, bombastic.  She's angry.

18   He's far more low key.  I think that's the sum and substance of

19   the calls.

20             The call with him and Internal Affair ends about three

21   or four minutes later.  There is a conversation that what police

22   can do and can't do.  They tell him they can open a, they can

23   turn him into a confidential informant.  They basically explain

24   the process.

25             I got to say, from the tone of the calls, it doesn't

1    sound like they launched any investigation.  It doesn't sound

2    like anybody wrote anything down at all.  I don't know, though.

3    And so that's one of the things I think we would be entitled to.

4    And I haven't talked to the government about whether there is

5    such a thing in existence.  But if it's out there, I would like

6    it.

7                I think one of the other things we talked about --

8                THE COURT:  Well, let me just stop with that and see --

9                MR. HURSON:  Sure.

10               THE COURT:  -- Mr. Hoff, if you would mind inquiring,

11   or maybe you already have.

12               MR. HOFF:  I already have.  And Mr. Hurson's correct in

13   kind of Mr. Martin's calling.  They do say, "Are you making a

14   complaint?"  And he says no.  And then I did follow up, though,

15   to see if anything had, if there was an investigation opened or

16   if there was anything pending.  As far as what they had, what

17   they told me last week was there was no investigation in relation

18   to those phone calls.  I think that is because, on the phone

19   call, Mr. Martin did indicate he was not making a complaint.

20               So I did follow up on that.  There is no investigation

21   in relation to those phone calls.

22               THE COURT:  Okay.

23               MR. HURSON:  The other issue that came up on Friday was

24   that Mr. Martin had apparently made attempts to get firearms from

25   two other people.  He testified two other people.  I had asked

1    him who those people were and I think that -- there was an

2    objection.  I know there was an objection.  I think Your Honor

3    had instructed the government to get those names.  I don't think

4    you instructed the government to give them to me.  I thought you

5    had.  But Mr. Hoff and I talked about it.  It's probably more

6    likely you just instructed him to get the names.

7            But I think I'm entitled to those names.  I haven't

8    briefed the issue as to why I'm entitled to those names.

9            It seems clear, I think, I think I might be able to

10   figure out who one of them is just based on investigation,

11   because of the marijuana arrest.  Actually, I'm not sure, because

12   that leads to the next point, which is a search warrant affidavit

13   that was apparently done by Detective Clark.  So I'm making

14   things way more confusing than I need do.

15           The testimony from Detective Clark, as I remember it,

16   was that there was another operation involving Mr. Martin on the

17   22nd but -- and I'm coloring it as Mr. Wallner would, I'm

18   editorializing -- but he didn't have much to do with it, is what

19   I remember him saying.  Our understanding is, from the

20   government, that there was a search warrant affidavit authored

21   based on whatever happened on the night of the 22nd involving Mr.

22   Martin.  And I have to assume that what they're talking about is

23   what Mr. Martin talked about, which was when he actually went to

24   another residence, entered that residence with the intention of

25   getting a gun, and marijuana, but was only able to get marijuana.

1    I think you remember that testimony.

2              THE COURT:  Yes.

3              MR. HURSON:  He, of course, testified he was in

4    constant contact with Detective Clark.  My understanding is

5    there's a search warrant affidavit that came out of something Mr.

6    Martin did that night.  I don't know who authored it.  I'm

7    assuming it was Detective Clark, but I could be wrong.  And I'm

8    also assuming it had something to do with that operation that he

9    testified to, but I don't know.

10             What I do know is the government informed me there is a

11   search warrant affidavit.  And I think, based on all the

12   testimony that came out and, again, I haven't briefed it, that we

13   should get a copy of that.  I don't even know if it remains

14   sealed.

15             I think there was testimony that there was a marijuana

16   arrest.  But I don't know the defendant.

17             THE COURT:  Okay.

18             MR. HURSON:  And I think we should get that.

19             THE COURT:  Mr. Hoff.

20             MR. HOFF:  Well, Your Honor, the government's position

21   is certainly that that information is privileged.  As far as the

22   CI's involvement in any investigation for other individuals is,

23   or who the government is investigating in relation to other

24   individuals for a confidential informant, certainly, it's never

25   been, in my experience, that all, any and all cases related to a

1    confidential informant involved in or relative to a particular

2    case, I think that it's the government's position that that's

3    privileged information as far as the CI's involvement in other

4    investigations.  And certainly with respect to the search

5    warrant, that would be the same position, Your Honor.

6         THE COURT:  Okay.  Well, I'm not, I'm not prepared to

7    resolve it this minute.  I think in general, Mr. Hoff, I might

8    agree with you if there was some other completely unrelated

9    investigation the CS was involved in.  This is a little closer

10   because it involves events about which Mr. Martin testified.

11   They were also a part of this process of getting to Mr. Jeter.

12   You know, maybe you all can continue to talk about it a little

13   bit.  If there's maybe some redacted version that can be turned

14   over.

15        But if you don't, if you wind up not agreeing on this,

16   then, Mr. Hurson, I guess I'll have to ask that it be briefed,

17   and the government can respond.  If I need to look at some

18   documents in camera, I can do that.

19        MR. HURSON:  If I may.  My position is I don't know if

20   the search warrant really is something that comes out of an

21   earlier investigation.  But I think the testimony was clear that

22   it was, he signed up on the 22nd and he finished his service on

23   the 23rd.

24        THE COURT:  Right.

25        MR. HURSON:  And I think for purposes of impeachment of

1    Detective Clark at trial, the testimony from Detective Clark was:

2    I didn't have anything to do with anything.  Again, it's getting

3    better in my mind as time goes on.

4              But the point is, if he really did author a search

5    warrant, I think the Court needs to know if he was the author.

6    And I am happy to be subject to any sort of confidentiality,

7    protective orders, even just for attorney's eyes only.  That's

8    okay.  But I can't really properly argue why I feel I'm entitled

9    to it if I don't even know necessarily what it is.

10             THE COURT:  Mr. Hoff, do you know who authored the

11   affidavit?

12             MR. HOFF:  Yes, Your Honor.  It was Detective Clark.

13             THE COURT:  Well, Mr. Hurson's argument is getting

14   stronger.  You might want to think about it.  Again, if you can't

15   come to some agreement -- again, I don't have a transcript in

16   front of me, either.  I recall Detective Clark eventually, when

17   asked on cross, did recall that.  My recollection is that there

18   was another officer that we didn't hear from that was sort of the

19   main person on that part of the investigation.  But I don't know

20   how it then happened that Detective Clark wrote the affidavit.

21   Maybe based on information from someone else.

22             So the argument that's being made is credibility.

23   Let's focus on that.  Again, if you can't come to some agreement,

24   let's get it briefed quickly.

25             MR. HOFF:  Yes, Your Honor.

1          THE COURT:  Anything else.

2          MR. HOFF:  The only other thing I wanted to ask Your

3     Honor, as far as the IAD records, does Your Honor -- the

4     government has obtained those records.  So I am in the process of

5     I guess preparing a summary for Your Honor.

6          THE COURT:  Okay.

7          MR. HOFF:  Is there a timeline that Your Honor would

8     like those in chambers?

9          THE COURT:  Well, obviously, we do have a little bit of

10    time.  I mean, is a week enough?  What's your -- what do you

11    need?

12         MR. HOFF:  That would probably be enough, Your Honor.

13    Could I, I guess could I submit them to the Court on the October

14    6th date, the date of the conference call?

15         THE COURT:  Sure.

16         MR. HOFF:  Thank you.

17         THE COURT:  That should be fine.  I mean, that's

18    before, certainly before, obviously, I'm going to make any

19    ruling.  And it's well before trial.  So if I find that there is

20    information that should be disclosed to Mr. Hurson, we can take

21    it up.

22         MR. HOFF:  Thank you, Your Honor.

23         MR. HURSON:  Thank you.  I think that's it.

24         THE COURT:  All right.  That's fine, then.  Thank you

25    very much.  And I will talk to you at least on October 6th at

1    9:30.

2              MR. HOFF:  Thank you, Your Honor.

3              THE COURT:  Thank you.

4              (Conclusion of Proceedings at 10:58 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                INDEX

2

3                                                          PAGE

4    GOVERNMENT'S WITNESS

5    WITNESS: DETECTIVE MICHAEL GLENN
     DIRECT EXAMINATION BY MR. HOFF                          2
6    CROSS EXAMINATION BY MR. HURSON                         8

7    DEFENSE WITNESS

8    WITNESS: WILLIAM KANWISHER
     DIRECT EXAMINATION BY MR. HURSON                       19
9    CROSS EXAMINATION BY MR. HOFF                          40
     REDIRECT EXAMINATION BY MR. HURSON                     41
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>REPORTER'S CERTIFICATE</u>

1

2

3          I, Mary M. Zajac, do hereby certify that I recorded

4    stenographically the proceedings in the matter of USA v. Arthur

5    Jeter, Case Number(s) CCB-14-121, on September 19, 2014.

6          I further certify that the foregoing pages constitute

7    the official transcript of proceedings as transcribed by me to

8    the within matter in a complete and accurate manner.

9          In Witness Whereof, I have hereunto affixed my

10   signature this _____ day of _____, 2014.

11

12

13

14                        _____
                          Mary M. Zajac,
15                        Official Court Reporter

16

17

18

19

20

21

22

23

24

25

**'**

**'94** [6] - 30:7, 31:20, 36:16, 37:4, 37:5, 38:7

**1**

**10** [6] - 24:2, 24:3, 40:5, 40:15, 40:20, 40:24
**101** [1] - 1:24
**10:58** [1] - 53:4
**11** - 24:24, 40:14, 40:22, 40:24
**12** - 25:12, 25:14
**13** [1] - 38:3
**13th** [1] - 5:4
**14** [2] - 32:5, 38:10
**15** [2] - 17:18, 38:12
**15th** [1] - 42:10
**16** [1] - 38:14
**17** [1] - 38:19
**17th** [1] - 19:25
**18** [1] - 38:23
**18th** [1] - 7:1
**19** [4] - 1:11, 39:4, 54:8, 55:5
**19-A** [1] - 39:7
**1994** [1] - 36:19
**1:30** [2] - 21:4, 36:13

**2**

**2** [1] - 54:5
**20** [8] - 11:6, 17:5, 17:18, 26:20, 27:9, 31:17, 33:6, 37:14
**20-year-old** [1] - 37:5
**2013** [7] - 12:16, 13:4, 13:8, 13:10, 20:19, 20:23, 22:2
**2014** [11] - 1:11, 3:22, 5:2, 5:4, 5:12, 5:16, 7:2, 7:3, 9:4, 55:5, 55:10
**20th** [3] - 3:22, 4:13, 9:4
**21** [2] - 11:7, 34:18
**21201** [1] - 1:24
**22nd** [4] - 5:11, 48:17, 48:21, 50:22
**23rd** [9] - 7:20, 7:24, 20:19, 20:21, 20:23, 21:14, 22:2, 50:23
**24th** [1] - 7:25
**280** [1] - 26:17
**284** [1] - 26:18
**28th** [3] - 5:9, 5:12, 5:16
**29th** [1] - 5:24

**3**

**34** [2] - 34:16, 34:17

**4**

**40** [1] - 54:9
**41** [1] - 54:9

**5**

**50** [1] - 28:10

**6**

**6** [3] - 5:2, 21:6, 32:4
**6th** [8] - 43:9, 43:11, 43:24, 44:2, 44:21, 44:22, 52:14, 52:25

**7**

**7** [1] - 28:10

**8**

**8** [1] - 54:6
**80** [1] - 30:25
**80-feet** [1] - 31:4

**9**

**9:30** [1] - 44:2, 44:21, 53:1
**9:43** [1] - 2:1

**A**

**a.m** [2] - 2:1, 53:4
**ability** [1] - 8:12
**able** [18] - 4:14, 5:21, 5:25, 16:24, 17:23, 21:12, 21:15, 22:11, 23:4, 26:2, 29:3, 30:20, 32:3, 34:17, 42:19, 48:9, 48:25
**absolutely** [3] - 15:22, 16:5, 25:22
**accurate** [1] - 55:8
**accurately** [1] - 25:25
**action** [1] - 3:18
**actual** [2] - 33:24, 37:1
**advance** [1] - 18:4
**advantage** [1] - 16:22
**aerial** [3] - 17:3, 21:7, 23:6
**Affair** [1] - 46:20
**Affairs** [1] - 45:9
**affidavit** [9] - 10:15, 11:14, 18:13, 48:12, 48:20, 49:5, 49:11, 51:11, 51:20
**affixed** [1] - 55:9
**agent** [2] - 8:7, 15:13
**ago** [1] - 20:16
**agree** [2] - 16:10, 50:8
**agreeing** [1] - 50:15
**agreement** [2] - 51:15, 51:23
**ahead** [4] - 3:3, 11:4, 15:25, 18:25
**aimed** [1] - 28:14
**alley** [6] - 22:13, 23:2, 24:23, 29:24, 30:8, 30:16
**allow** [1] - 33:14
**AMERICA** [1] - 1:5
**amount** [2] - 27:18, 27:21
**angle** [5] - 21:16, 22:9, 39:19, 39:20, 40:15
**angle-in** [1] - 21:16
**angry** [1] - 46:17
**answer** [1] - 29:18
**anyway** [4] - 38:9, 42:1, 45:18
**apart** [1] - 12:9
**apologize** [2] - 15:5, 18:21
**Appearances** [1] - 1:15
**application** [1] - 11:23
**approach** [3] - 11:5, 22:20, 42:4
**approached** [1] - 37:18
**approaching** [1] - 39:2
**approximate** [7] - 20:21, 21:12, 21:15, 22:24, 23:20, 24:6, 29:15
**area** [9] - 17:2, 17:11, 21:7, 25:9, 25:25, 30:25, 35:19, 35:21, 40:17
**argue** [1] - 51:8
**argument** [2] - 51:13, 51:22
**arrange** [1] - 31:12
**arranged** [1] - 37:8
**arrest** [2] - 48:11, 49:16
**arrested** [2] - 45:25, 46:16
**arrived** [2] - 21:3, 32:10
**arrow** [2] - 22:22, 22:24
**ARTHUR** [1] - 1:7
**Arthur** [6] - 2:2, 3:7, 4:11, 6:1, 19:17, 55:4
**ascertain** [2] - 3:13, 3:25
**aspects** [1] - 25:11
**assigned** [2] - 3:6, 19:17, 19:18
**Assistant** [2] - 2:4, 2:5
**assume** [4] - 28:21, 42:18, 45:17, 45:24, 46:14, 48:22
**assumed** [1] - 18:6
**assuming** [2] - 49:7, 49:8
**astronaut** [1] - 2:23
**ATF** [4] - 6:10, 6:15, 6:22, 8:7
**attachment** [3] - 11:11, 14:10, 14:11
**attempt** [2] - 28:23, 31:7, 35:5
**attempting** [2] - 30:16, 34:25
**attempts** [2] - 25:10, 47:24
**attended** [1] - 36:12
**attending** [1] - 5:20
**Attorney** [2] - 2:4, 2:5
**Attorney's** [1] - 13:16
**attorney's** [1] - 51:7
**auctioned** [1] - 37:2
**audio** [1] - 35:17
**author** [2] - 51:4, 51:5
**authored** [4] - 48:20, 49:6, 51:10
**available** [3] - 5:12, 5:14, 44:25
**Avenue** [1] - 21:7
**average** [1] - 34:13
**aware** [3] - 12:12, 12:18, 13:6

**B**

**bad** [2] - 16:15, 18:13
**bag** [2] - 6:12, 11:19
**Baltimore** [21] - 1:11, 1:24, 2:6, 3:10, 3:16, 3:19, 4:11, 4:15, 5:6, 5:13, 9:8, 9:9, 9:10, 9:15, 13:20, 21:8, 32:18, 32:19, 33:15, 33:25, 45:10
**based** [8] - 16:1, 17:14, 32:15, 43:7, 48:10, 48:21, 49:11, 51:21
**basis** [2] - 15:17, 16:7
**battery** [3] - 11:25, 12:7, 12:10
**battery's** [1] - 12:7
**BCDC** [6] - 5:16, 6:8,
**9:5**, 9:6, 11:18, 13:14
**beginning** [4] - 26:20, 27:8, 33:7, 42:16
**Behalf** [2] - 1:16, 1:18
**behalf** [2] - 2:4, 2:10
**behind** [7] - 9:11, 9:19, 17:12, 32:19, 34:2, 34:13, 39:14
**Belnord** [2] - 21:8, 36:9
**belonged** [1] - 9:17
**below** [3] - 21:17, 37:22
**bench** [3] - 42:7, 44:18, 44:20
**benefit** [1] - 15:1
**best** [2] - 28:25, 30:17
**better** [4] - 23:1, 23:7, 44:15, 51:3
**between** [9] - 13:3, 21:1, 21:2, 26:2, 26:14, 27:12, 28:18, 30:20, 34:13
**beyond** [2] - 26:9, 28:3
**bind** [1] - 15:10
**binoculars** [7] - 28:6, 28:9, 28:11, 28:14, 28:24, 29:10, 29:14
**birth** [1] - 42:14
**bit** [8] - 24:18, 26:9, 34:15, 34:16, 34:17, 38:25, 39:5, 50:13, 52:9
**black** [1] - 23:11
**Blake** [1] - 1:13
**block** [5] - 21:8, 22:12, 32:18, 33:1, 40:11
**blocking** [2] - 41:9, 41:11
**body** [1] - 39:23
**bombastic** [1] - 46:17
**Booking** [2] - 9:9, 9:14
**brand** [1] - 7:9
**breaking** [1] - 31:9
**Brendan** [2] - 1:19, 2:9
**briefed** [4] - 48:8, 49:12, 50:16, 51:24
**briefing** [1] - 43:7
**briefly** [3] - 3:24, 40:4
**bring** [1] - 23:23
**brought** [1] - 28:6
**BY** [15] - 3:5, 9:1, 11:9, 19:12, 22:19, 23:17, 24:17, 27:22, 40:3, 41:8, 54:5, 54:6, 54:8, 54:9, 54:9

**C**

**Cafal** [1] - 8:8
**calendar** [1] - 42:3
**camera** [4] - 27:6, 38:2,

38:18, 50:18

**car** [50] - 17:12, 17:13, 17:22, 30:2, 30:6, 30:11, 30:15, 30:19, 30:21, 30:24, 31:2, 31:6, 31:19, 31:24, 32:6, 32:11, 32:20, 33:4, 34:3, 34:13, 35:4, 35:5, 35:7, 35:9, 35:15, 36:17, 36:24, 37:1, 37:2, 37:5, 37:8, 37:10, 37:16, 37:18, 38:11, 38:13, 38:16, 38:20, 38:22, 38:24, 39:1, 39:6, 39:9, 39:13, 39:17, 39:21, 39:22, 40:20, 40:23

**card** [1] - 12:6
**cars** [7] - 22:23, 28:18, 35:20, 35:24, 40:17, 41:9
**cars.com** [1] - 37:7
**case** [20] - 3:7, 3:9, 3:18, 4:21, 4:23, 9:21, 12:12, 12:15, 12:25, 13:19, 15:13, 16:14, 16:15, 18:9, 18:15, 19:17, 19:18, 19:20, 41:23, 50:2
**Case** [1] - 55:5
**CASE** [1] - 1:6
**cases** [2] - 15:14, 49:25
**catch** [1] - 35:6
**catching** [1] - 24:16
**Catherine** [1] - 1:13
**CCB-14-0121** [2] - 1:6, 2:3
**CCB-14-121** [1] - 55:5
**cell** [19] - 3:13, 3:14, 3:17, 3:20, 6:3, 6:5, 6:6, 6:16, 6:18, 6:20, 7:6, 7:8, 8:13, 8:16, 8:18, 12:24, 13:2, 13:7, 34:25
**Center** [11] - 3:10, 3:19, 4:11, 4:15, 5:6, 5:13, 9:8, 9:9, 9:10, 13:20, 13:25
**Central** [2] - 9:9, 9:14
**certain** [2] - 25:11, 32:16
**certainly** [11] - 12:21, 15:10, 15:15, 17:4, 18:18, 27:16, 44:6, 49:21, 49:24, 50:4, 52:18
**CERTIFICATE** [1] - 55:1
**certify** [2] - 55:3, 55:6
**chambers** [1] - 52:8
**chance** [3] - 20:8, 30:4, 36:14
**change** [1] - 24:19
**changes** [1] - 42:2
**character** [1] - 31:18

**charge** [1] - 46:16
**charged** [1] - 46:5
**checked** [1] - 3:16
**Cheryl** [1] - 36:3
**child** [2] - 36:11, 42:14
**CI's** [2] - 49:22, 50:3
**circumstances** [3] - 15:16, 18:16, 20:4
**City** [12] - 3:10, 3:16, 3:19, 4:11, 4:15, 5:6, 5:13, 9:8, 9:9, 9:10, 13:20, 45:10
**Clark** [9] - 48:13, 48:15, 49:4, 49:7, 51:1, 51:12, 51:16, 51:20
**clear** [12] - 9:16, 15:23, 28:6, 29:20, 29:21, 29:22, 30:1, 35:16, 43:9, 44:10, 48:9, 50:21
**clearer** [1] - 16:23
**clearly** [1] - 28:23
**CLERK** [3] - 2:19, 19:5, 19:10
**close** [2] - 20:22, 41:25
**closed** [1] - 6:12
**closer** [1] - 50:9
**closing** [1] - 41:19
**color** [1] - 7:8
**coloring** [1] - 48:17
**coming** [5] - 26:18, 27:23, 27:24, 30:10, 33:15
**comments** [2] - 18:3, 18:6
**communications** [1] - 13:3
**complaint** [2] - 47:14, 47:19
**complete** [2] - 45:17, 55:8
**completed** [1] - 11:14
**completely** [2] - 16:10, 50:8
**compliance** [2] - 5:1, 5:2
**complying** [1] - 14:1
**computer** [1] - 26:19
**conclusion** [1] - 53:4
**conditions** [3] - 20:21, 20:22, 32:23
**conference** [11] - 18:22, 41:21, 42:7, 43:1, 43:22, 44:1, 44:18, 44:20, 44:22, 44:24, 52:14
**confidential** [5] - 12:15, 45:9, 46:23, 49:24, 50:1
**confidentiality** [1] - 51:6
**confused** [2] - 9:12, 24:9

**confusing** [1] - 48:14
**constant** [1] - 49:4
**constitute** [1] - 55:6
**contact** [2] - 35:1, 49:4
**contacted** [3] - 4:8, 10:12, 10:14
**contains** [1] - 45:22
**context** [1] - 20:10
**continue** [1] - 50:12
**continued** [1] - 4:25
**continuing** [1] - 2:13
**Control** [1] - 3:16
**conversation** [3] - 16:21, 46:6, 46:21
**copy** [6] - 10:18, 10:22, 11:4, 11:10, 11:14, 49:13
**corner** [4] - 17:8, 24:4, 27:24, 36:8
**correct** [41] - 9:18, 9:19, 10:5, 10:6, 10:16, 11:14, 12:1, 12:10, 12:13, 12:16, 12:19, 12:25, 13:8, 13:11, 15:22, 19:20, 19:21, 21:10, 21:15, 23:19, 25:23, 25:25, 26:25, 27:3, 27:9, 28:8, 28:12, 29:8, 30:2, 32:7, 32:8, 33:17, 34:8, 34:19, 35:10, 40:5, 40:10, 40:15, 40:18, 41:3, 47:12
**correspondent** [1] - 10:13
**counsel** [3] - 18:10, 41:21, 42:4
**count** [2] - 24:20, 27:15
**counting** [3] - 23:2, 24:21, 27:12
**couple** [2] - 28:4, 39:19
**course** [4] - 3:18, 12:21, 17:14, 49:3
**Court** [10] - 14:10, 17:14, 20:9, 23:6, 31:12, 34:3, 35:23, 51:5, 52:13, 55:15
**COURT** [68] - 1:1, 2:8, 2:12, 2:16, 2:24, 3:3, 8:24, 10:24, 11:3, 11:8, 14:5, 14:7, 14:13, 14:15, 14:18, 14:21, 15:7, 15:25, 18:1, 18:3, 18:24, 22:15, 22:18, 23:9, 23:14, 23:16, 23:22, 23:25, 24:9, 24:15, 27:21, 39:25, 41:6, 41:14, 42:6, 42:11, 42:15, 42:25, 43:3, 43:11, 43:18, 43:21, 44:1, 44:4, 44:9, 44:11, 44:17, 44:19, 45:14,

45:16, 46:3, 47:8, 47:10, 47:22, 49:2, 49:17, 49:19, 50:6, 50:24, 51:10, 51:13, 52:1, 52:6, 52:9, 52:15, 52:17, 52:24, 53:3
**court** [7] - 4:6, 11:11, 19:19, 19:21, 43:25, 44:15, 44:16
**Court's** [1] - 8:14
**Courthouse** [1] - 1:23
**cover** [2] - 30:18, 31:4
**covered** [1] - 31:14
**create** [1] - 30:10
**creation** [1] - 31:1
**credibility** [1] - 51:22
**Criminal** [1] - 2:3
**CRIMINAL** [1] - 1:6
**cross** [4] - 8:25, 22:8, 27:25, 51:17
**CROSS** [3] - 40:2, 54:6, 54:9
**crosswalk** [4] - 21:17, 26:9, 28:3, 28:4
**CS** [3] - 13:3, 13:7, 50:9
**curb** [4] - 32:25, 33:3, 33:8
**curious** [1] - 36:2
**cut** [1] - 29:20
**cuts** [1] - 30:8

## D

**Dannenfelser** [2] - 8:9, 8:10
**Darin** [1] - 2:22
**DARIN** [1] - 3:1
**date** [13] - 4:12, 5:1, 5:2, 7:19, 20:19, 42:1, 42:9, 42:21, 43:8, 43:10, 43:12, 52:14
**dates** [2] - 43:6, 44:25
**Davis** [2] - 37:17, 39:3
**Davis's** [1] - 33:23
**days** [1] - 20:16
**December** [7] - 12:16, 12:25, 13:4, 13:7, 13:10, 42:10, 42:16
**decided** [1] - 31:5
**deciding** [1] - 16:4
**declaring** [1] - 15:14
**decreases** [1] - 39:20
**Defendant** [2] - 1:8, 1:18
**defendant** [3] - 5:3, 45:2, 49:16
**DEFENDANT'S** [1] - 19:3
**Defendant's** [18] - 21:5,

21:22, 22:3, 22:6, 22:16, 22:25, 23:8, 24:3, 24:24, 25:12, 25:14, 26:20, 27:8, 37:14, 38:3, 38:10, 38:23, 39:4
**defendant's** [3] - 38:12, 38:14, 38:19
**Defender's** [1] - 19:14
**defense** [2] - 15:11, 18:10
**Defense** [2] - 40:4, 40:14
**DEFENSE** [1] - 54:7
**definitely** [1] - 30:3
**degree** [2] - 27:17, 27:21
**deliver** [1] - 36:4
**Department** [2] - 2:7, 45:10
**depicted** [1] - 26:10
**depicting** [1] - 24:4
**describe** [1] - 31:14
**described** [4] - 21:16, 24:7, 28:25, 37:19
**desk** [2] - 9:11, 9:19
**Detective** [2] - 2:15, 9:2, 9:3, 15:18, 17:7, 21:10, 21:13, 26:3, 26:15, 27:3, 27:12, 28:12, 29:13, 48:13, 48:15, 49:4, 49:7, 51:1, 51:12, 51:16, 51:20
**DETECTIVE** [2] - 2:17, 54:5
**detective** [4] - 3:6, 9:2, 9:4, 37:2
**detectives** [1] - 3:18
**Detention** [10] - 3:10, 3:19, 4:11, 4:15, 5:6, 5:13, 9:8, 9:9, 9:10, 13:20, 13:25
**determine** [1] - 11:20, 43:4
**different** [3] - 17:3, 38:15, 38:20
**difficult** [4] - 22:23, 24:20, 28:18, 29:1
**difficulties** [1] - 44:12
**DIRECT** [4] - 3:4, 19:11, 54:5, 54:8
**direct** [1] - 26:7
**direction** [1] - 26:18
**directly** [4] - 2:19, 19:5, 33:5, 34:2
**disclosed** [2] - 18:12, 52:20
**discovery** [2] - 18:7, 44:14
**discuss** [5] - 42:13, 42:20, 44:24, 45:4

discussed [2] - 42:9, 44:12
dismissal [2] - 36:10, 36:12
disregard [1] - 17:4
distance [9] - 26:13, 27:5, 30:17, 30:18, 30:20, 31:2, 31:4, 31:15
DISTRICT [2] - 1:1, 1:2
Division [1] - 45:10
DIVISION [1] - 1:2
Docket [1] - 2:3
document [2] - 4:6, 38:2
documents [1] - 50:18
done [2] - 45:21, 48:13
door [2] - 32:6, 39:9
down [18] - 9:15, 14:7, 24:20, 24:22, 26:8, 26:17, 32:7, 33:19, 33:20, 37:8, 38:21, 39:13, 39:18, 39:20, 39:22, 40:9, 41:15, 47:2
drive [1] - 32:17
driver [1] - 28:20
driver's [4] - 30:2, 37:18, 39:2, 39:14
driving [5] - 17:11, 33:10, 33:11, 35:3, 36:18
during [2] - 19:19, 44:24
duty [1] - 37:2

### E

early [2] - 36:10, 36:12
earpiece [1] - 44:7
eased [2] - 33:24, 33:25
easier [1] - 14:11
easy [1] - 37:23
Edgewater [1] - 37:7
editorializing [2] - 27:20, 48:18
educate [1] - 20:7
Eight [1] - 22:3
eight [2] - 17:18, 27:15
either [1] - 51:16
employed [1] - 19:13
end [6] - 29:8, 29:12, 29:13, 33:19, 33:20, 44:18
ends [1] - 46:20
entered [1] - 48:24
entitled [4] - 47:3, 48:7, 48:8, 51:8
Esquire [3] - 1:17, 1:17, 1:19
essence [1] - 46:10
essentially [1] - 40:14

establish [2] - 30:17, 31:23, 32:2, 32:16
event [1] - 15:12
events [4] - 16:9, 20:25, 21:2, 50:10
eventually [1] - 51:16
Evidence [1] - 3:16
evidence [8] - 6:10, 6:23, 14:10, 14:15, 18:17, 18:22, 19:1, 41:20
exactly [5] - 25:9, 30:24, 31:13, 34:7, 45:19
EXAMINATION [10] - 3:4, 8:25, 19:11, 40:2, 41:7, 54:5, 54:6, 54:8, 54:9, 54:9
examination [1] - 37:12
examine [2] - 36:14, 37:10
excused [1] - 41:14
execute [1] - 8:11
executed [5] - 7:22, 7:23, 7:25, 8:18, 13:7
execution [1] - 8:5
Exhibit [15] - 21:6, 21:22, 22:3, 22:6, 22:16, 22:20, 22:21, 24:3, 27:8, 27:12, 31:17, 33:6, 40:4, 40:14, 40:20
exhibit [1] - 40:22
exhibits [2] - 11:6, 20:9
existed [1] - 27:18
existence [1] - 47:5
exists [1] - 45:20
exiting [1] - 17:9
experience [2] - 8:12, 49:25
explain [2] - 34:23, 46:23
explained [1] - 36:9
extent [1] - 28:21
extrapolate [1] - 38:25
eye [4] - 27:6, 38:18, 38:21, 39:13
eyes [1] - 51:7

### F

Facility [2] - 9:10, 9:14
fact [4] - 13:6, 31:24, 36:22, 40:25
facts [1] - 16:15
fair [2] - 31:7, 34:6
fairly [2] - 18:8, 41:25
Fairmont [1] - 17:8
Fairmount [10] - 21:8, 21:18, 22:5, 22:8, 22:9, 24:5, 25:1, 27:24, 36:9
fairness [1] - 41:16

falling [1] - 37:21
far [12] - 8:5, 10:25, 24:21, 28:16, 30:23, 41:20, 42:5, 46:18, 47:16, 49:21, 50:3, 52:3
fast [13] - 31:9, 31:13, 31:15, 31:23, 31:25, 32:22, 33:11, 33:12, 34:7, 35:7, 35:8, 35:9, 35:18
faster [1] - 34:4
fastest [2] - 32:3, 34:17
fault [1] - 18:23
fax [2] - 13:16, 13:21
faxed [2] - 13:18, 13:20
FCC [1] - 11:22
FCRR [1] - 1:23
February [4] - 3:22, 4:13, 5:16, 9:4
federal [1] - 19:14
feet [3] - 26:17, 26:18, 30:25
few [2] - 10:21, 18:3
figure [3] - 31:3, 36:21, 48:10
file [2] - 14:12, 45:21
filings [1] - 11:12
film [1] - 16:3
filmed [1] - 16:8
fine [8] - 14:13, 42:22, 43:2, 43:18, 44:3, 44:17, 52:17, 52:24
finished [2] - 21:3, 50:22
firearms [1] - 47:24
first [11] - 18:3, 20:6, 26:16, 30:17, 33:2, 34:10, 36:20, 40:19, 45:23, 46:10
five [3] - 27:16, 38:18
five-nine [1] - 38:18
flat [1] - 31:11
flat-out [1] - 31:11
floor [3] - 37:22, 39:14, 39:16
Floor [1] - 1:23
focus [2] - 11:1, 51:23
foliage [7] - 22:23, 23:21, 27:18, 27:21, 41:1, 41:11, 41:12
follow [3] - 14:1, 47:14, 47:20
follow-up [1] - 14:1
FOR [1] - 1:2
force [2] - 3:6, 12:12
foregoing [1] - 55:6
forgot [1] - 44:7
forth [1] - 7:9
forward [1] - 28:4
foul [1] - 46:8

four [6] - 22:13, 23:2, 24:21, 24:22, 27:16, 46:21
fourth [1] - 24:22
Fourth [1] - 1:23
free [1] - 17:4
Friday [8] - 19:21, 20:2, 20:11, 30:6, 39:3, 44:14, 45:7, 47:23
friday [1] - 1:11
friend [3] - 45:24, 46:1, 46:7
front [4] - 11:13, 37:20, 40:17, 51:16
full [2] - 2:20, 19:6
funeral [1] - 5:20
future [1] - 15:14

### G

game [1] - 35:6
gathered [1] - 18:6
general [1] - 50:7
girlfriend [1] - 45:9
given [2] - 18:15, 35:1
Glenn [6] - 2:6, 2:15, 2:23, 3:6, 9:4, 15:9
GLENN [3] - 2:17, 2:23, 54:5
Glenn's [1] - 15:18
Google [1] - 17:3
Government [1] - 1:16
government [17] - 2:4, 14:23, 15:5, 18:25, 33:4, 44:4, 44:23, 45:1, 45:12, 47:4, 48:3, 48:4, 48:20, 49:10, 49:23, 50:17, 52:4
government's [4] - 2:14, 14:15, 14:20, 50:2
GOVERNMENT'S [2] - 2:17, 54:4
grand [6] - 5:14, 9:21, 10:4, 12:13, 12:20, 13:6
great [1] - 19:2
guess [8] - 15:3, 23:12, 41:25, 42:12, 50:16, 52:5, 52:13
gun [3] - 37:21, 46:5, 48:25
guy [1] - 31:17

### H

hand [1] - 33:8
happy [1] - 51:6
hard [7] - 23:20, 25:17, 31:14, 33:8, 35:25, 37:23, 39:23

harder [2] - 39:18, 39:20
heading [1] - 30:11
hear [2] - 32:24, 51:18
heard [5] - 16:2, 18:13, 20:10, 32:15, 41:18
hearing [2] - 2:13, 14:24, 15:2, 15:8, 16:6, 18:9, 18:11, 19:20, 19:21, 19:22, 29:25, 45:6
Hearing [1] - 1:10
hearings [1] - 15:1
help [3] - 10:22, 16:4, 31:12
helpful [8] - 17:2, 17:24, 18:4, 18:17, 20:8, 22:25, 24:18, 41:22
hereby [1] - 55:3
hereunto [1] - 55:9
hide [1] - 16:15
Hill [16] - 17:7, 21:10, 21:13, 22:1, 24:7, 24:10, 26:3, 26:8, 26:15, 26:17, 27:3, 27:13, 28:2, 28:12, 28:20, 29:13
himself [1] - 46:12
hitting [1] - 37:20
Hoff [17] - 1:17, 2:3, 10:1, 10:12, 13:24, 40:1, 41:16, 47:10, 48:5, 49:19, 50:7, 51:10
HOFF [22] - 2:2, 2:15, 3:2, 3:5, 10:23, 10:25, 14:6, 14:17, 14:22, 42:12, 42:16, 43:9, 43:20, 44:3, 44:6, 47:12, 49:20, 51:12, 52:5, 52:7, 52:12, 52:16, 52:22, 53:2, 54:5, 54:9
Hoff's [1] - 18:18
holding [2] - 27:6, 38:18
honest [1] - 29:6
Honor [49] - 2:7, 2:9, 2:15, 3:2, 8:14, 8:23, 9:2, 10:23, 10:25, 11:6, 14:4, 14:6, 14:8, 14:9, 14:17, 14:19, 14:22, 15:6, 15:17, 15:21, 16:4, 17:17, 22:17, 23:12, 23:23, 24:12, 26:5, 27:19, 28:17, 32:8, 40:4, 41:5, 42:4, 42:8, 44:6, 45:6, 45:22, 48:2, 49:20, 50:5, 51:12, 51:25, 52:3, 52:5, 52:7, 52:12, 52:22, 53:2
Honorable [1] - 1:13
hopefully [2] - 31:12,

43:16
**house** [1] - 24:22
**houses** [2] - 22:13, 24:19
**hum** [2] - 29:9, 38:5
**Hurson** [19] - 1:19, 2:9, 8:24, 11:4, 14:18, 14:24, 34:25, 35:1, 35:2, 35:4, 35:6, 35:9, 39:25, 42:8, 42:20, 43:13, 45:5, 50:16, 52:20
**HURSON** [43] - 2:9, 9:1, 11:5, 11:9, 14:9, 14:14, 14:19, 15:22, 16:1, 18:2, 18:21, 19:2, 19:12, 22:19, 23:17, 23:23, 24:1, 24:11, 24:17, 27:22, 41:8, 41:13, 42:22, 43:2, 43:16, 43:23, 44:7, 44:10, 44:13, 45:6, 45:15, 45:17, 46:4, 47:9, 47:23, 49:3, 49:18, 50:19, 50:25, 52:23, 54:6, 54:8, 54:9
**Hurson's** [2] - 47:12, 51:13

## I

**IAD** [1] - 52:3
**icon** [2] - 23:12, 23:16
**ID** [2] - 11:22, 12:3
**ideal** [1] - 42:24
**identification** [1] - 11:7
**IID** [1] - 45:16
**imagination** [1] - 29:4
**impeachment** [1] - 50:25
**important** [3] - 16:12, 21:2, 31:24
**importantly** [1] - 20:3
**impound** [1] - 36:25
**IN** [1] - 1:1
**indeed** [1] - 15:9
**INDEX** [1] - 54:1
**indicate** [1] - 47:19
**indicated** [4] - 18:10, 26:13, 33:23, 40:10
**indicating** [2] - 14:25, 23:9
**indicating)** [2] - 21:21, 23:3
**indicted** [2] - 5:3, 5:4
**individual** [1] - 10:5
**individuals** [5] - 12:13, 17:6, 20:4, 49:22, 49:24
**indulgence** [1] - 8:14
**inevitable** [1] - 18:7

**informant** [4] - 12:15, 46:23, 49:24, 50:1
**information** [22] - 4:5, 4:6, 4:14, 4:17, 5:11, 7:5, 7:7, 7:8, 7:10, 7:15, 7:17, 8:13, 9:16, 16:5, 16:19, 18:11, 20:2, 20:5, 49:21, 50:3, 51:21, 52:20
**informed** [1] - 49:10
**initial** [2] - 15:8, 15:11
**initiate** [2] - 44:4, 44:23
**inquiring** [2] - 46:15, 47:10
**inside** [1] - 12:20
**institution** [1] - 4:4
**instructed** [2] - 48:3, 48:4, 48:6
**instrument** [1] - 26:16
**Intake** [2] - 9:10, 9:14
**intend** [1] - 17:16
**intended** [1] - 16:14
**intent** [2] - 6:4, 8:1
**intention** [1] - 48:24
**Internal** [2] - 45:9, 46:20
**investigate** [1] - 20:6
**investigating** [1] - 49:23
**investigation** [10] - 45:21, 47:1, 47:15, 47:17, 47:20, 48:10, 49:22, 50:9, 50:21, 51:19
**investigations** [1] - 50:4
**investigator** [7] - 2:10, 15:13, 16:3, 16:19, 19:18, 20:13, 32:11
**involved** [5] - 12:24, 13:2, 17:6, 50:1, 50:9
**involvement** [2] - 49:22, 50:3
**involves** [1] - 50:10
**involving** [4] - 3:7, 34:20, 48:16, 48:21
**issue** [4] - 18:7, 42:5, 47:23, 48:8
**issued** [1] - 4:10
**issues** [3] - 20:7, 44:14, 45:4
**itself** [4] - 11:16, 27:17, 31:7, 39:13

## J

**jail** [2] - 10:10, 46:9
**James** [2] - 1:17, 2:5
**January** [1] - 42:21
**Jencks** [1] - 36:3
**JETER** [1] - 1:7

**Jeter** [19] - 2:2, 2:10, 3:7, 3:13, 3:19, 3:25, 4:11, 5:4, 6:1, 6:3, 9:18, 13:3, 19:17, 21:14, 30:15, 42:23, 44:7, 50:11, 55:5
**Jeter's** [2] - 3:15, 13:14
**jog** [1] - 31:21
**joined** [1] - 2:10
**Joseph** [1] - 20:13
**judge** [1] - 35:16
**Judge** [1] - 1:13
**June** [3] - 7:1, 7:25
**jury** [6] - 5:14, 9:21, 10:4, 12:13, 12:20, 13:6

## K

**K-A-N-W-I-S-H-E-R** [1] - 19:9
**Kanwisher** [16] - 2:11, 14:20, 14:22, 14:24, 16:2, 16:23, 17:1, 17:23, 18:19, 19:8, 19:13, 23:18, 24:3, 24:12, 26:19, 27:23
**KANWISHER** [2] - 19:3, 54:8
**Kanwisher's** [1] - 15:12
**keep** [3] - 15:15, 18:18, 20:12
**Kenwood** [38] - 17:8, 19:22, 21:7, 21:18, 21:25, 22:5, 22:8, 22:10, 22:12, 22:14, 24:5, 24:6, 25:1, 25:3, 25:5, 25:8, 25:21, 26:4, 26:6, 26:12, 27:24, 29:8, 29:12, 29:13, 30:9, 30:19, 30:21, 31:6, 32:20, 33:16, 35:2, 35:20, 35:24, 40:10, 40:11, 40:18, 41:10
**Kenwood's** [1] - 26:14
**key** [1] - 46:18
**kind** [3] - 31:14, 42:9, 47:13
**known** [2] - 16:10, 16:13

## L

**language** [1] - 46:8
**large** [1] - 18:23
**last** [21] - 2:21, 2:23, 8:7, 16:2, 18:9, 19:7, 19:9, 19:19, 19:21, 19:24, 20:2, 20:10, 20:11, 20:16, 30:6,

32:15, 35:12, 39:3, 39:5, 41:22, 47:17
**launched** [1] - 47:1
**leads** [1] - 48:12
**learned** [4] - 16:6, 18:11, 20:2, 45:8
**least** [2] - 4:19, 52:25
**leave** [1] - 35:19
**leaves** [1] - 29:6
**left** [4] - 2:5, 2:6, 24:2, 43:24
**legal** [1] - 46:9
**legible** [1] - 23:5
**lengths** [1] - 31:2
**less** [1] - 40:17
**level** [4] - 27:6, 38:18, 38:21, 39:13
**license** [1] - 36:21
**lieu** [1] - 5:14
**lieutenant** [3] - 3:24, 9:11, 9:19
**light** [1] - 42:25
**likely** [2] - 46:13, 48:6
**Lincoln** [3] - 30:7, 31:20, 36:16, 37:4, 38:7
**lines** [1] - 23:11
**listen** [1] - 35:17
**listening** [1] - 18:19
**listing** [3] - 4:19, 9:20
**located** [2] - 12:7, 27:3
**location** [3] - 21:13, 26:14, 29:15
**Lombard** [1] - 1:24
**longest** [1] - 34:14
**look** [5] - 8:20, 17:23, 29:7, 39:6, 50:17
**looked** [2] - 17:22, 20:18, 29:10
**looking** [11] - 11:24, 21:25, 22:5, 22:9, 24:5, 24:10, 24:14, 25:2, 38:21, 39:12, 39:13
**looks** [2] - 40:20
**low** [1] - 46:18

## M

**ma'am** [4] - 2:18, 2:22, 3:1, 19:8
**magnification** [1] - 28:9
**mail** [1] - 36:4
**main** [1] - 51:19
**manner** [3] - 16:14, 17:2, 55:8
**map** [1] - 17:3
**Maps** [1] - 17:3
**March** [2] - 5:2, 5:4
**marijuana** [4] - 48:11, 48:25, 49:15

**Mark** [9] - 17:20, 30:7, 31:20, 36:14, 36:16, 36:19, 37:5, 38:7, 38:8
**mark** [5] - 21:19, 22:21, 23:4, 23:18, 23:22
**marked** [1] - 21:5
**Martin** [15] - 15:20, 17:10, 21:14, 30:7, 36:17, 36:24, 45:25, 46:13, 47:19, 47:24, 48:16, 48:22, 48:23, 49:6, 50:10
**Martin's** [7] - 29:23, 30:15, 31:20, 32:20, 34:3, 35:5, 47:13
**Mary** [3] - 1:23, 55:3, 55:14
**MARYLAND** [1] - 1:2
**Maryland** [3] - 1:11, 1:24, 37:8
**matter** [2] - 55:4, 55:8
**Matthew** [2] - 1:17, 2:3
**ME** [1] - 12:3
**mean** [6] - 6:11, 7:7, 18:23, 34:2, 45:17, 52:10, 52:17
**meant** [2] - 18:24, 24:12
**measure** [1] - 30:20
**measurements** [1] - 26:2
**measuring** [1] - 26:5
**meet** [1] - 37:8
**meets** [1] - 39:22
**memorialize** [1] - 38:17
**mentions** [1] - 41:1
**Mercury** [1] - 17:20
**met** [2] - 12:21, 37:9
**Michael** [2] - 2:6, 2:22
**MICHAEL** [2] - 2:17, 54:5
**microphone** [2] - 2:20, 19:6
**mid** [2] - 32:18, 33:1
**mid-block** [1] - 32:18
**middle** [2] - 2:24, 33:4
**might** [11] - 17:2, 17:24, 18:25, 23:1, 23:7, 27:25, 44:15, 44:25, 48:9, 50:7, 51:14
**Mike** [1] - 2:15
**mind** [4] - 18:18, 32:22, 47:10, 51:3
**minute** [1] - 50:7
**minutes** [3] - 17:5, 17:18, 46:21
**missing** [1] - 40:23
**mistake** [1] - 24:13
**model** [6] - 11:16, 11:17, 11:19, 17:21, 36:17, 36:22

**month** [1] - 20:20
**morning** [6] - 2:9, 5:24, 42:9, 44:2, 44:21
**most** [3] - 20:3, 21:1, 26:16
**mostly** [2] - 28:18, 29:1
**motion** [3] - 11:2, 16:5, 28:24
**motions** [10] - 14:24, 15:1, 15:8, 16:6, 18:9, 18:11, 19:19, 19:21, 19:22, 29:25
**Motions** [2] - 1:10, 2:13
**move** [3] - 14:10, 28:19, 35:9
**moved** [8] - 28:20, 33:10, 37:18, 38:15, 38:20, 38:24, 39:5, 39:8
**movement** [1] - 28:22
**movements** [1] - 30:15
**moving** [4] - 30:15, 31:13, 35:4, 35:7
**MR** [76] - 2:2, 2:9, 2:15, 3:2, 3:5, 9:1, 10:23, 10:25, 11:5, 11:9, 14:6, 14:9, 14:14, 14:17, 14:19, 14:22, 15:17, 15:22, 16:1, 18:2, 18:21, 19:2, 19:12, 22:19, 23:17, 23:23, 24:1, 24:11, 24:17, 27:19, 27:22, 40:3, 41:8, 41:13, 42:4, 42:8, 42:12, 42:16, 42:22, 43:2, 43:9, 43:13, 43:16, 43:20, 43:23, 44:3, 44:6, 44:7, 44:10, 44:13, 45:6, 45:15, 45:17, 46:4, 47:9, 47:12, 47:23, 49:3, 49:18, 49:20, 50:19, 50:25, 51:12, 51:25, 52:2, 52:7, 52:12, 52:16, 52:22, 52:23, 53:2, 54:5, 54:6, 54:8, 54:9, 54:9
**MVA** [1] - 36:21

# N

**name** [13] - 2:20, 2:21, 2:22, 2:23, 2:24, 7:9, 8:7, 10:4, 19:6, 19:7, 19:9, 36:7, 46:14
**names** [4] - 48:3, 48:6, 48:7, 48:8
**necessarily** [1] - 51:9
**necessity** [1] - 45:2
**need** [7] - 7:11, 7:13, 45:14, 45:15, 48:14, 50:17, 52:11

**needs** [1] - 51:5
**never** [1] - 49:24
**new** [2] - 18:22, 45:7
**next** [3] - 3:18, 43:1, 48:12
**night** [2] - 48:21, 49:6
**nine** [2] - 19:16, 38:18
**Nine** [6] - 22:6, 22:16, 22:20, 22:21, 23:18, 24:15
**NO** [1] - 1:6
**nobody** [2] - 9:12, 9:16
**noon** [1] - 21:1
**normal** [2] - 31:16, 33:12
**North** [25] - 21:7, 21:25, 22:5, 22:10, 22:12, 22:14, 24:5, 25:2, 25:5, 25:7, 25:21, 26:3, 26:6, 26:12, 26:14, 30:8, 30:19, 30:20, 31:6, 32:20, 35:2, 35:20, 40:10, 40:17, 41:9
**north** [8] - 21:17, 22:1, 22:5, 22:14, 24:5, 24:10, 24:11, 29:13
**NORTHERN** [1] - 1:2
**note** [1] - 16:12
**nothing** [1] - 16:16
**notwithstanding** [1] - 28:19
**November** [1] - 42:24
**number** [11] - 7:9, 11:22, 12:3, 12:10, 22:12, 24:2, 26:14, 33:17, 35:24, 36:21
**Number** [19] - 2:3, 17:9, 22:6, 22:20, 22:21, 23:8, 23:9, 23:18, 23:19, 24:2, 24:15, 28:14, 28:16, 30:10, 40:5, 40:14, 40:15, 40:22
**Number(s** [1] - 55:5
**numbers** [1] - 12:6
**numerous** [1] - 41:1

# O

**object** [1] - 14:23
**objection** [6] - 10:23, 15:5, 15:21, 27:19, 48:2
**observation** [1] - 24:7
**observations** [2] - 20:4, 21:14, 22:11
**observe** [1] - 35:19
**observing** [2] - 11:24, 26:8
**obstruction** [3] - 29:1, 29:2, 39:22

**obstructions** [3] - 28:17, 41:1, 41:2
**obtain** [12] - 4:14, 4:19, 5:21, 6:5, 7:5, 7:7, 7:8, 7:10, 8:2, 8:4, 11:23
**obtained** [7] - 4:17, 7:15, 7:16, 7:20, 7:24, 11:18, 52:4
**obviously** [7] - 18:4, 18:19, 35:23, 41:17, 42:24, 52:9, 52:18
**occasions** [1] - 13:15
**occurring** [1] - 20:22
**October** [13] - 20:18, 20:21, 20:23, 21:13, 22:2, 42:23, 43:9, 43:11, 44:2, 44:21, 44:22, 52:13, 52:25
**OF** [2] - 1:2, 1:5
**office** [1] - 6:9
**Office** [2] - 13:16, 19:14
**Officer** [7] - 22:1, 24:7, 24:10, 26:7, 26:17, 28:2, 28:20
**officer** [5] - 3:6, 12:12, 46:7, 46:11, 51:18
**officers** [5] - 15:20, 16:24, 17:12, 31:10, 32:25
**official** [1] - 55:7
**Official** [1] - 55:15
**once** [2] - 11:18, 31:23
**one** [36] - 10:13, 11:11, 12:6, 16:12, 17:22, 21:2, 21:3, 23:2, 24:20, 24:22, 27:2, 27:15, 31:10, 33:2, 33:9, 33:11, 33:12, 33:19, 33:22, 34:14, 34:19, 35:11, 35:12, 37:6, 39:19, 39:20, 40:19, 40:21, 40:23, 45:8, 47:3, 47:7, 48:10
**ones** [1] - 33:3
**open** [3] - 44:15, 44:16, 46:22
**opened** [5] - 6:9, 6:11, 11:18, 45:21, 47:15
**opening** [1] - 32:6
**opens** [1] - 42:23
**operation** [2] - 48:16, 49:8
**optimistic** [1] - 42:12
**order** [1] - 12:10
**ordered** [4] - 43:16, 43:23, 43:24, 44:25
**orders** [1] - 51:7
**ordinarily** [1] - 16:18
**original** [1] - 23:23
**otherwise** [1] - 41:19
**ourselves** [1] - 20:7

**outcome** [1] - 4:24
**outside** [3] - 11:21, 35:7, 35:9
**own** [1] - 11:6

# P

**pace** [2] - 31:16, 31:21
**pacing** [1] - 27:4
**PAGE** [1] - 54:3
**pages** [1] - 55:6
**panel** [2] - 37:19, 38:16, 39:18
**parallel** [1] - 39:8
**parameters** [1] - 32:17
**parent** [1] - 36:11
**park** [1] - 30:5
**parked** [19] - 17:10, 21:18, 28:3, 29:7, 29:15, 29:21, 29:22, 29:24, 30:6, 30:15, 30:21, 31:19, 32:25, 33:3, 33:8, 33:9, 34:15, 35:24, 35:25
**parking** [4] - 21:16, 33:9, 35:25, 37:9
**part** [6] - 9:10, 16:6, 42:12, 42:18, 50:11, 51:19
**particular** [6] - 11:2, 18:16, 20:7, 30:25, 41:23, 50:1
**particularly** [2] - 20:3, 43:6
**passenger** [4] - 28:21, 35:14, 39:11, 39:14
**past** [1] - 4:14
**pause** [1] - 8:15
**paying** [1] - 43:17
**pedestrian** [1] - 35:22
**pending** [1] - 47:16
**people** [6] - 17:22, 30:10, 35:20, 47:25, 48:1
**perhaps** [3] - 23:22, 41:25, 43:3
**person** [4] - 10:7, 10:9, 30:10, 51:19
**perspective** [2] - 16:8, 17:7
**perspectives** [1] - 17:6
**phone** [37] - 3:13, 3:14, 3:17, 3:20, 4:18, 4:21, 4:23, 4:25, 6:3, 6:5, 6:6, 6:16, 6:18, 6:20, 7:6, 7:8, 7:11, 7:13, 7:18, 8:2, 8:3, 8:13, 8:16, 8:18, 8:20, 11:21, 11:24, 12:9, 12:24, 13:2, 13:7, 35:1, 45:8, 47:18, 47:21
**photo** [1] - 23:7

**photograph** [6] - 21:24, 21:25, 22:4, 24:4, 25:15, 39:5
**photographed** [1] - 6:10
**photographs** [2] - 6:13, 26:10
**phrase** [2] - 33:24, 34:1
**picked** [2] - 5:12, 10:10
**pickup** [1] - 10:14
**picture** [10] - 22:15, 22:18, 25:16, 25:23, 38:4, 38:6, 38:7, 40:7, 40:15, 40:18
**pictures** [7] - 16:4, 17:5, 17:18, 17:24, 19:1, 37:11, 37:25
**pinched** [1] - 34:1
**place** [3] - 20:25, 21:2, 29:23
**placed** [3] - 6:10, 6:15, 45:8
**placement** [1] - 20:3
**places** [1] - 16:7
**plan** [1] - 15:9
**play** [1] - 17:16
**playing** [1] - 27:11
**point** [15] - 3:9, 5:5, 6:22, 8:21, 10:25, 13:25, 17:8, 18:18, 24:7, 28:11, 31:10, 35:3, 39:15, 48:12, 51:4
**pointed** [1] - 45:7
**pointing** [1] - 23:19
**Police** [3] - 2:6, 3:16, 45:10
**police** [5] - 15:20, 16:13, 16:16, 32:24, 46:21
**policy** [1] - 15:14
**position** [6] - 24:6, 30:7, 31:19, 37:24, 49:20, 50:2, 50:5, 50:19
**possession** [2] - 8:17, 9:17
**possibilities** [1] - 32:22
**possible** [2] - 42:1, 42:21
**possibly** [1] - 31:7
**postal** [1] - 36:2
**postpone** [1] - 43:11
**postponement** [1] - 42:1
**power** [2] - 28:9, 28:10
**practice** [2] - 13:16, 16:18
**precise** [3] - 23:6, 26:16, 30:24
**precisely** [1] - 16:24
**prepared** [1] - 50:6

**preparing** [1] - 52:5
**present** [8] - 16:20,
18:16, 18:22, 40:20,
41:17, 43:5, 45:2, 46:7
**presented** [1] - 45:2
**preserved** [1] - 16:17
**presumably** [1] - 43:18
**previously** [3] - 15:4,
18:12, 21:5
**privileged** [2] - 49:21,
50:3
**privy** [1] - 46:6
**probable** [1] - 46:1
**problem** [2] - 28:17,
29:5
**proceeded** [1] - 37:10
**Proceedings** [2] - 2:1,
53:4
**proceedings** [3] - 8:15,
55:4, 55:7
**process** [4] - 8:1, 46:24,
50:11, 52:4
**produce** [1] - 46:8
**produced** [1] - 46:13
**producing** [1] - 20:9
**professional** [1] - 15:12
**proffer** [1] - 15:24
**pronounce** [1] - 8:7
**properly** [1] - 51:8
**Property** [1] - 6:15
**property** [25] - 3:13,
3:15, 3:20, 3:25, 4:10,
4:15, 4:19, 4:20, 5:12,
5:14, 5:19, 6:1, 6:2, 6:3,
6:7, 6:9, 6:11, 6:12,
9:17, 9:20, 10:10, 10:14,
11:18, 11:19, 13:14
**protective** [1] - 51:7
**provided** [2] - 15:4,
45:12
**Public** [1] - 19:14
**pull** [2] - 33:3, 34:15
**pulled** [2] - 17:12, 34:2,
35:13, 36:10
**pulling** [4] - 32:19,
33:5, 33:7, 34:13
**purports** [1] - 45:23
**purpose** [1] - 16:15
**purposes** [1] - 50:25
**put** [1] - 45:1
**putting** [1] - 18:25

## Q

**quarter** [3] - 37:19,
38:16, 39:18
**questions** [7] - 8:23,
10:21, 11:3, 14:4, 39:24,
41:5, 41:13

**quickly** [1] - 51:24

## R

**ran** [1] - 36:20
**range** [4] - 31:16, 32:2,
34:5, 34:12
**ranges** [1] - 32:16
**rate** [2] - 33:10, 33:12
**re** [2] - 30:10, 31:1
**re-create** [1] - 30:10
**re-creation** [1] - 31:1
**ready** [2] - 10:10, 10:14
**realistic** [1] - 42:18
**realized** [1] - 20:8
**really** [6] - 29:3, 36:6,
38:16, 50:20, 51:4, 51:8
**reason** [4] - 15:15,
15:20, 37:16, 41:25
**reasonable** [1] - 33:10
**reasonably** [1] - 18:10
**reasons** [4] - 16:13,
33:22, 37:23, 39:19
**rebuttal** [4] - 15:3,
41:17, 43:4, 45:2
**recalibrated** [1] - 26:11
**receive** [1] - 4:1
**received** [2] - 5:11, 6:1
**recently** [1] - 15:10
**recognize** [1] - 21:6
**recollection** [1] - 51:17
**record** [7] - 2:20, 11:10,
11:11, 14:23, 19:6,
41:19, 42:7
**record's** [1] - 44:10
**recorded** [1] - 55:3
**records** [4] - 13:7,
13:10, 52:3, 52:4
**recreate** [1] - 25:10
**red** [2] - 23:12, 23:16
**redacted** [1] - 50:13
**REDIRECT** [2] - 41:7,
54:9
**redirect** [3] - 14:5, 14:6,
41:6
**reenact** [1] - 16:24
**reenacted** [1] - 16:9
**reenactment** [6] - 17:9,
17:11, 34:10, 34:19,
35:14, 36:1
**reference** [2] - 4:15,
11:16
**referenced** [1] - 11:22
**referred** [1] - 29:24
**reflects** [1] - 25:25
**regarding** [1] - 7:8
**related** [3] - 15:18, 18:6,
49:25
**relation** [5] - 3:9, 15:19,

47:17, 47:21, 49:23
**relative** [1] - 50:1
**relay** [1] - 16:19
**released** [1] - 5:19
**remains** [1] - 49:13
**remember** [10] - 21:10,
25:9, 25:19, 25:20,
27:11, 27:12, 28:9,
48:15, 48:19, 49:1
**report** [1] - 16:14
**Reported** [1] - 1:22
**REPORTER** [1] - 2:24
**Reporter** [1] - 55:15
**REPORTER'S** [1] - 55:1
**reports** [1] - 16:16
**representation** [2] -
15:7, 15:11
**requested** [1] - 43:13
**residence** [1] - 48:24
**resolve** [1] - 50:7
**respect** [2] - 31:1, 50:4
**respond** [2] - 3:18,
50:17
**responded** [2] - 6:9,
9:8, 9:12
**response** [3] - 4:1, 4:7,
18:24
**responsibility** [1] -
13:13
**restaurant** [1] - 37:9
**retrieve** [3] - 5:25, 6:2,
8:13
**retrieved** [1] - 6:7
**reversed** [1] - 28:5
**right-hand** [1] - 33:8
**road** [1] - 40:9
**roof** [1] - 39:22
**row** [1] - 24:19
**RPR** [1] - 1:23
**ruling** [2] - 41:24, 52:19
**run** [3] - 31:9, 31:25,
32:1
**running** [3] - 31:6,
31:19, 31:25

## S

**sale** [1] - 37:6
**scene** [2] - 16:3, 16:4
**scheduled** [1] - 42:17
**scheduling** [2] - 42:5,
44:9
**school** [4] - 36:7, 36:8,
36:12
**screen** [1] - 21:19
**scrutiny** [1] - 4:4
**sealed** [1] - 49:14
**search** [22] - 6:5, 7:5,
7:16, 7:17, 7:20, 7:22,

7:23, 7:24, 8:2, 8:4, 8:5,
8:11, 10:15, 11:10,
11:13, 48:12, 48:20,
49:5, 49:11, 50:4, 50:20,
51:4
**season** [1] - 20:20
**seat** [5] - 28:21, 35:14,
37:20, 37:21, 39:11
**seated** [2] - 2:19, 19:5
**second** [3] - 6:23,
33:22, 46:13
**seconds** [4] - 32:4,
32:5, 34:16, 34:18
**Section** [1] - 3:17
**see** [41] - 3:19, 6:3,
11:3, 17:2, 18:1, 22:9,
23:12, 23:20, 23:22,
24:19, 25:18, 28:16,
28:19, 28:23, 29:1, 29:3,
29:6, 29:10, 29:14,
29:17, 29:18, 29:20,
30:1, 34:3, 35:7, 35:23,
37:9, 37:23, 38:17,
38:24, 39:12, 39:14,
39:16, 39:17, 39:19,
39:20, 39:23, 42:2, 47:8,
47:15
**seeing** [1] - 37:19
**Segreti** [1] - 20:14
**seizure** [11] - 6:5, 7:16,
7:17, 7:20, 7:22, 7:23,
7:24, 8:2, 8:4, 8:5, 8:11
**seller** [1] - 37:7
**send** [2] - 13:16, 13:21
**sense** [2] - 42:21, 43:1
**September** [3] - 1:11,
19:25, 55:5
**Sergeant** [3] - 33:23,
37:17, 39:3
**serial** [1] - 7:9
**seriousness** [1] - 18:15
**serve** [2] - 13:13, 13:15
**served** [1] - 13:19
**service** [1] - 50:22
**set** [1] - 43:6
**Seven** [31] - 17:9,
21:22, 21:25, 22:5,
22:10, 22:12, 22:14,
22:22, 23:8, 23:10,
23:19, 24:5, 25:2, 25:5,
25:7, 25:21, 26:6, 26:12,
26:14, 27:12, 28:14,
28:16, 30:11, 30:19,
30:20, 31:2, 31:6, 35:2,
35:20, 40:10, 40:17
**seven** [1] - 43:14
**seven-day** [1] - 43:14
**severe** [1] - 4:4
**shady** [1] - 31:18
**shields** [4] - 5:13, 5:19,

10:13
**shooting** [2] - 38:16,
39:1
**show** [6] - 21:5, 21:19,
25:12, 32:10, 38:2, 40:19
**showed** [1] - 40:21
**showing** [10] - 21:22,
22:3, 22:6, 23:8, 26:20,
31:17, 33:6, 37:14, 38:3,
40:4
**shows** [3] - 21:8, 27:17,
27:21
**sic** [1] - 19:23
**side** [5] - 14:16, 30:2,
37:18, 39:2, 39:15
**signal** [1] - 35:1
**signature** [1] - 55:10
**signed** [2] - 10:15,
50:22
**significant** [1] - 16:6
**silver** [1] - 12:6
**similar** [3] - 22:4, 24:24,
25:1
**sit** [1] - 14:25
**sitting** [4] - 15:2, 18:19,
32:6, 35:14
**six** [3] - 27:14, 31:21,
33:18
**Six** [2] - 22:25, 23:8
**slow** [2] - 31:21, 33:20
**slowed** [1] - 33:19
**slowest** [1] - 32:4
**small** [1] - 39:9
**sold** [2] - 38:8, 38:9
**someone** [6] - 31:5,
36:10, 45:23, 45:24,
51:21
**sometime** [1] - 21:4
**sorry** [9] - 7:24, 8:9,
9:7, 18:23, 22:17, 24:12,
24:13, 38:8, 40:5
**sort** [6] - 15:13, 16:22,
31:11, 45:21, 51:6, 51:18
**sound** [2] - 47:1
**source** [1] - 45:9
**south** [9] - 22:9, 24:10,
24:14, 24:15, 25:2, 29:8,
29:12, 29:24, 30:8, 30:16
**speaking** [1] - 25:10
**speaks** [1] - 27:17
**Special** [1] - 3:2
**specific** [2] - 7:18, 10:4
**specifically** [2] - 16:7,
16:24
**speed** [2] - 33:10, 33:13
**speeds** [1] - 31:8
**spell** [3] - 2:21, 2:24,
19:7
**spelled** [1] - 2:23
**spot** [7] - 22:1, 26:3,

26:7, 26:9, 27:7, 27:12, 35:25
**spots** [1] - 33:9
**sprint** [1] - 31:11
**staff** [2] - 19:18, 20:13
**stand** [2] - 15:9, 21:12
**standing** [3] - 21:13, 22:4, 26:3
**start** [2] - 35:3, 35:4
**started** [3] - 26:6, 35:2, 37:4
**state** [3] - 2:20, 15:5, 19:6
**STATES** [2] - 1:1, 1:5
**States** [3] - 2:2, 2:4, 2:5
**status** [1] - 44:24
**stenographically** [1] - 55:4
**step** [3] - 14:7, 38:20, 41:14
**steps** [14] - 22:5, 25:5, 25:7, 25:17, 25:21, 26:3, 26:12, 26:14, 27:2, 28:4, 28:16, 31:6, 35:2, 41:9
**still** [3] - 41:24, 43:23, 46:16
**stood** [5] - 16:7, 16:8, 21:20, 25:5, 25:7
**stop** [2] - 27:19, 47:8
**stopped** [2] - 17:12, 33:1
**Streeper** [11] - 17:11, 21:9, 32:11, 32:18, 33:20, 34:13, 35:4, 35:25, 36:1
**street** [4] - 22:8, 27:25, 29:8, 33:4
**Street** [10] - 1:24, 17:11, 19:23, 21:8, 32:12, 33:15, 33:20, 33:21, 34:1, 34:13
**stronger** [1] - 51:14
**subject** [1] - 51:6
**submit** [2] - 17:17, 52:13
**submitted** [1] - 3:17
**subpoena** [14] - 4:6, 4:10, 5:1, 5:15, 9:21, 10:4, 13:6, 13:13, 13:18, 13:19, 14:2, 45:11, 45:14, 45:18
**substance** [3] - 12:18, 44:8, 46:18
**sum** [2] - 12:18, 46:18
**summarize** [2] - 44:13, 44:19
**summary** [1] - 52:5
**supplemental** [1] - 43:7
**supposedly** [2] - 17:10, 24:9

**Suppress** [1] - 2:13
**surprised** [2] - 18:10, 35:22
**sweatshirt** [3] - 37:19, 37:20, 37:21
**switch** [1] - 26:19
**SWORN** [2] - 2:17, 19:3

**T**

**table** [2] - 14:25, 15:2
**tape** [1] - 46:6
**task** [2] - 3:6, 12:12
**technical** [1] - 8:12
**telephone** [4] - 11:16, 11:17, 11:19, 11:20
**tentative** [1] - 42:9
**terminal** [1] - 26:19
**terms** [1] - 20:9
**testified** [10] - 12:13, 12:16, 12:20, 16:10, 17:12, 22:2, 47:25, 49:3, 49:9, 50:10
**testifies** [1] - 14:23
**testify** [2] - 15:23, 18:5
**testifying** [3] - 15:3, 15:16, 18:2
**testimony** [33] - 12:18, 12:22, 15:2, 15:4, 15:18, 15:19, 16:2, 17:14, 17:21, 18:20, 20:10, 21:10, 28:20, 30:6, 30:14, 31:10, 32:15, 32:24, 33:23, 36:24, 37:17, 39:3, 40:25, 41:2, 41:23, 43:19, 48:15, 49:1, 49:12, 49:15, 50:21, 51:1
**TFO** [1] - 15:9
**THE** [82] - 1:1, 1:2, 2:8, 2:12, 2:16, 2:18, 2:19, 2:22, 2:24, 3:1, 3:3, 8:24, 10:24, 11:3, 11:8, 14:5, 14:7, 14:8, 14:13, 14:15, 14:18, 14:21, 15:7, 15:25, 18:1, 18:3, 18:24, 19:4, 19:5, 19:8, 19:10, 22:15, 22:17, 22:18, 23:9, 23:14, 23:15, 23:16, 23:22, 23:25, 24:9, 24:13, 24:15, 24:16, 27:21, 39:25, 41:6, 41:14, 42:6, 42:11, 42:15, 42:25, 43:3, 43:11, 43:18, 43:21, 44:1, 44:4, 44:9, 44:11, 44:17, 44:19, 45:14, 45:16, 46:3, 47:8, 47:10, 47:22, 49:2,

49:17, 49:19, 50:6, 50:24, 51:10, 51:13, 52:1, 52:6, 52:9, 52:15, 52:17, 52:24, 53:3
**threatened** [1] - 46:7
**three** [5] - 23:2, 24:21, 24:22, 27:16, 46:20
**throughout** [3] - 8:1, 8:16, 29:25
**thrown** [1] - 37:20
**timed** [2] - 32:9, 34:10
**timeline** [1] - 52:7
**timing** [2] - 20:4, 34:8
**today** [3] - 18:25, 41:20, 45:3
**today's** [1] - 43:19
**together** [1] - 27:15
**tone** [1] - 46:25
**took** [18] - 6:13, 16:3, 18:22, 20:25, 25:14, 25:23, 26:25, 27:2, 28:4, 31:21, 32:11, 34:2, 34:15, 34:16, 37:15, 37:25, 38:11, 40:7
**top** [1] - 39:16
**touch** [1] - 39:12
**towards** [9] - 22:1, 22:5, 22:10, 24:5, 25:2, 26:17, 30:15, 31:19, 35:4
**traffic** [6] - 27:25, 32:23, 33:14, 33:22, 33:25, 35:23
**transcribed** [1] - 55:7
**transcript** [7] - 41:23, 43:5, 43:8, 43:14, 44:25, 51:15, 55:7
**trees** [3] - 27:11, 28:18, 29:6
**trial** [10] - 14:25, 15:2, 42:1, 42:17, 43:8, 43:24, 44:22, 45:1, 51:1, 52:19
**triangular** [2] - 39:10, 39:17
**trick** [1] - 29:4
**tried** [6] - 29:7, 31:8, 32:9, 32:21, 33:2, 45:11
**tries** [1] - 35:11
**Troy** [2] - 8:7, 8:9
**true** [5] - 12:3, 16:1, 16:5, 36:23, 41:4
**try** [12] - 22:24, 28:23, 28:25, 29:4, 30:17, 31:3, 31:5, 32:21, 35:5, 36:21, 37:1, 38:16
**trying** [15] - 24:20, 31:21, 31:23, 32:2, 32:16, 34:5, 34:6, 35:6, 35:8, 35:18, 37:4, 38:8, 39:6, 45:18
**turn** [4] - 6:18, 7:11,

33:15, 46:23
**turnaround** [1] - 43:14
**turned** [4] - 8:18, 26:10, 36:11, 50:13
**turning** [2] - 32:18, 32:19, 33:16
**turns** [2] - 18:17, 31:5
**two** [16] - 20:16, 21:1, 21:2, 23:2, 23:11, 24:21, 24:22, 27:15, 33:22, 35:11, 38:21, 38:23, 39:9, 47:25
**two-door** [1] - 39:9
**type** [1] - 10:15

**U**

**U.S** [2] - 1:23, 13:16
**um-hum** [2] - 29:9, 38:5
**unable** [1] - 20:5
**under** [2] - 4:4, 15:16
**underneath** [1] - 12:7
**understood** [6] - 21:16, 24:6, 26:7, 29:23, 31:19, 36:16
**unfair** [1] - 16:22
**unit** [1] - 21:8
**UNITED** [2] - 1:1, 1:5
**United** [3] - 2:2, 2:4, 2:5
**unless** [1] - 4:5
**unrelated** [1] - 50:8
**unusual** [1] - 18:8
**up** [36] - 5:12, 6:9, 6:11, 7:17, 10:10, 11:6, 11:18, 14:1, 17:12, 23:23, 27:23, 27:24, 32:18, 33:5, 33:9, 33:15, 34:2, 34:12, 34:13, 35:3, 35:13, 38:15, 38:20, 38:24, 39:8, 39:16, 40:11, 42:23, 44:14, 47:14, 47:20, 47:23, 50:15, 50:22, 52:21
**USA** [1] - 55:4
**uses** [1] - 46:14
**utilized** [1] - 8:18

**V**

**vantage** [1] - 17:8
**variance** [1] - 30:14
**various** [1] - 17:6
**vary** [1] - 31:21
**vehicle** [7] - 17:10, 29:7, 29:11, 29:14, 29:18, 29:21, 29:22, 29:23, 30:4, 30:5, 36:15
**vehicles** [1] - 40:9

**version** [1] - 50:13
**versus** [1] - 2:2
**video** [12] - 17:7, 17:16, 26:22, 27:6, 27:17, 27:23, 32:9, 35:10, 37:11, 37:15
**video's** [1] - 27:11
**videos** [2] - 27:2, 35:16
**videotape** [2] - 31:5, 34:11
**view** [11] - 21:7, 22:8, 23:1, 24:4, 25:1, 28:12, 28:25, 38:15, 38:20, 41:9, 46:1
**VII** [2] - 30:7, 31:20
**VIII** [6] - 17:20, 36:14, 36:16, 36:19, 37:5, 38:8
**vis-à-vis** [1] - 35:20

**W**

**walked** [4] - 9:8, 9:10, 26:6, 26:11
**walking** [6] - 26:17, 27:2, 27:6, 27:7, 31:9, 31:16, 36:11
**Wallner** [3] - 1:17, 2:5, 48:17
**WALLNER** [2] - 27:19, 43:13
**Walter** [1] - 19:8
**wants** [2] - 17:15, 43:7
**warrant** [26] - 6:5, 7:5, 7:16, 7:17, 7:20, 7:22, 7:23, 8:2, 8:4, 8:5, 8:11, 8:17, 10:15, 11:1, 11:13, 11:14, 11:16, 11:22, 11:23, 48:12, 48:20, 49:5, 49:11, 50:5, 50:20, 51:5
**warrant's** [1] - 11:10
**Wednesday** [11] - 16:1, 19:24, 20:10, 20:16, 20:17, 20:19, 21:24, 25:25, 26:23, 35:20, 41:22
**Wednesdays** [2] - 36:6, 36:13
**week** [7] - 16:2, 19:19, 32:15, 42:17, 43:1, 47:17, 52:10
**weight** [1] - 17:15
**West** [1] - 1:24
**wheel** [5] - 26:6, 26:10, 26:13, 26:16, 27:5
**Whereof** [1] - 55:9
**whichever** [2] - 14:11, 40:21
**whole** [1] - 17:16

**WILLIAM** [2] - 19:3, 54:8
**william** [1] - 19:8
**win** [1] - 39:9
**wind** [1] - 50:15
**window** [3] - 39:1, 39:11, 39:17
**window's** [1] - 39:10
**Witness** [1] - 55:9
**witness** [3] - 2:14, 11:6, 15:1
**WITNESS** [16] - 2:17, 2:18, 2:22, 3:1, 14:8, 19:3, 19:4, 19:8, 22:17, 23:15, 24:13, 24:16, 54:4, 54:5, 54:7, 54:8
**witnesses** [2] - 16:8, 16:9
**word** [1] - 39:10
**worker** [1] - 36:3
**writ** [1] - 18:23
**write** [2] - 9:21, 10:2
**written** [4] - 16:14, 16:16, 18:13, 18:14
**wrote** [3] - 7:16, 47:2, 51:20

## Y

**year** [3] - 17:20, 36:17, 36:22
**years** [1] - 19:16
**yesterday** [1] - 46:16
**yup** [2] - 37:15, 40:23

## Z

**Zajac** [3] - 1:23, 55:3, 55:14
**zero** [1] - 26:11
**zooming** [1] - 24:18