**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**UNITED STATES OF AMERICA** *

**v.** * **Criminal No. CCB-14-121**

**ARTHUR JETER** *

* * * * * * * * * * * * *

**REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S SUPPLEMENTAL MOTION TO SUPPRESS EVIDENCE[1]**

Defendant Arthur Jeter, by and through his undersigned counsel, James Wyda, Federal Public Defender for the District of Maryland, and Brendan A. Hurson, Assistant Federal Public Defender, hereby files this Reply to the Government's Response to Defendant's Supplemental Motion to Suppress Evidence (hereinafter "Response"):

**1. The Seizure of Mr. Jeter Rested Solely on the Word of an Unreliable and Incredible Source.**

As a threshold matter, the government does not rebut Mr. Jeter's argument regarding *when* he was seized by authorities. See Defendant's Supplemental to Motion to Suppress Evidence, 3 ("Thus, Mr. Jeter was seized when officers stopped in front and behind CI's vehicle in an unabashed show of authority intended to stop his movement."). Instead, the government retreads similar ground as it argues that officers had reasonable suspicion or probable cause to seize Mr. Jeter. Response, 1-4. In so doing, the government fails to address Mr. Jeter's point that though

---

[1] On October 6, 2014, the Court ordered that "[t]he government's supplemental filing is due October 14, 2014. . . . [and the] defendant's response shall be filed by October 21, 2014." Order Summarizing Conference Call, 1 (ECF/CM # 78). Mr. Jeter interprets the Court's Order to permit both parties to address the significance of the additional evidence submitted by the government and Mr. Jeter at the second motions hearing on Friday, September 19, 2014. Thus, this filing addresses some of the points raised by the government in its October 14th filing but also summarizes evidence elicited at the September 19, 2014 hearing.

there is ample reason to doubt the accuracy of certain of the officers' recollections of Mr. Jeter's arrest, the case does not rise or fall on officer credibility alone. Instead, the Court should find that authorities did not have sufficient facts to establish reasonable suspicion (or probable cause) to seize Mr. Jeter because the CI who provided the information on which the seizure was based was an unreliable and incredible source.

Seeking to rebut this well-substantiated point, the government implies that the failure to recover a weapon from Mr. Jeter when he sat on the steps of 7 North Kenwood purportedly smoking marijuana should have no impact on the Court's analysis of the CI's reliability because "the Defendant not having a weapon at that moment was consistent with the arrangements he had made with the CI." Response, 2. The government further states that "[t]he fact that the Defendant did not have the firearm during the first interaction with police officers did not harm the CI's credibility because the CI had always planned to come back and meet the Defendant to acquire the weapon at a later time." Id. These representations are inaccurate and inconsistent with the testimony of Det. Clark and the CI.

Contrary to the government's filing, there was no doubt that the CI and police believed Mr. Jeter would be armed when he was sitting on the steps of 7 North Kenwood and seized by police. As elicited by the government at the September 12, 2014 hearing:

Q (by AUSA Hoff): And why did you approach [Mr. Jeter] and pat him down?

A (by Det. Clark): Well, because Mr. Martin had relayed to me previously that Mr. Jeter ***was going to be armed***.

Q: So you believed Mr. Jeter may have the gun on him at that time?

A: Yes, sir.

Tr. of 9/12/14 Hearing, M-17,18 Lines 23:25; 1:3 (emphasis added). Even the CI acknowledged that he led law enforcement to believe that Mr. Jeter was going to possess a gun at the time Mr. Jeter was stopped on the front steps for allegedly smoking marijuana. Id. at M-119 Lines 12:17 ("Q: And what was said during that time?; A: That they jumped out on him because -- the police jumped out on him because they thought he was smoking weed, ***and they thought that he had the gun on him already*** . . . .") (emphasis added).[2] That Mr. Jeter did not have a weapon was not, as the government claims, "consistent with the arrangements [Mr. Jeter] had made with the CI," Response, 2. While it is true that the CI "had always planned to come back and meet the defendant to acquire the weapon at a later time," id., it is clear from all the testimony that the seizure of Mr. Jeter by police on the steps of the home *was* that "later time." According to the CI, Mr. Jeter was *supposed to be armed* when police seized him on the steps of 7 North Kenwood and Mr. Jeter's failure to possess a firearm at that time was not "consistent" with the CI's arrangements.

Because Mr. Jeter did not have a gun *at the time the CI promised he would*, the CI's credibility and reliability was severely damaged. Moreover, that he was later allegedly "proved" correct by Mr. Jeter's alleged possession of a firearm in his car later is of little moment since, "[i]n assessing the existence of probable cause, courts examine the totality of the circumstances known to the officer at the time of the arrest." See Taylor v. Waters, 81 F.3d 429, 434 (4th Cir.1996).

[2] The CI later noted that Mr. Jeter "ended up calling and telling [the CI] that he didn't feel like doing it because it was hot, meaning he was seeing the police." Tr. of 9/12/14 Hearing, M-119 Lines 15:23. This call, however, occurred *after* Mr. Jeter was already stopped and found to be unarmed and there was no testimony elicited from any witness indicating that the CI relayed this information to police or provided additional guarantees that Mr. Jeter would have a gun when he was seized for a second time. The only testimony elicited at the hearing is that the CI was informed that Mr. Jeter did not have a gun and was later "frantic" when Mr. Jeter emerged from 7 North Kenwood. Id. at M-19 Lines 16-21.

Of critical importance is the fact that this was the second time in less than 24 hours that the CI had failed to provide accurate information related to an alleged weapons purchase. The CI testified that one day prior to Mr. Jeter's arrest, the CI had secured an agreement from another person to purchase marijuana and a secure a handgun, but that he was unable to secure the handgun. Id. at 133 Lines 7-13. As recalled by the CI himself:

Q (by Counsel for Mr. Jeter): So you attempt to do the marijuana buy, and you said it went bad. What do you mean?

A(by CI): I didn't get the gun.

Q: You were attempting, you said, to do --

A: The whole point of the marijuana was to get the gun.

Q: Okay. So what you're saying is that you were actually doing a purchase of -- not for drugs, but you were trying to get a gun?

A: Correct.

Id. Accordingly, the information known to police when they stopped and seized Mr. Jeter in the vehicle failed to establish reasonable suspicion or probable cause as its source, a CI with tremendous incentive to lie, had twice provided inaccurate information to authorities related to firearms.

**2. Det. Clark Failed to Accurately Recall and Fully Detail Facts Bearing Heavily on the Assessment of the CI's Credibility.**

This "other operation" to recover a firearm was the subject of discussion among the parties and the Court during and after the motions hearings. Mr. Jeter submits that the testimony of Det. Clark regarding the CI's involvement in other operations should be weighed by the Court in assessing the CI's credibility. It should also play a role in weighing the accuracy of Det. Clark's recollections. The government rebuffs the allegation of deception or faulty recollection on the part

of Det. Clark by claiming that he testified truthfully about his involvement in an alleged marijuana purchase involving the CI.  Response, 3-4 ("In fact, Officer Clark testified that he wrote a report documenting the controlled purchase of marijuana.").  To the contrary, the testimony of Det. Clark measured against other testimony and government disclosures firmly establishes that Det. Clark's memory of Mr. Jeter's arrest is unreliable or, in the alternative, that his testimony omitted critical facts related to the CI's involvement in other operations in an effort to bolster the CI's testimony.

First, the government notes that "[i]n fact, Officer Clark testified that he wrote a report documenting the controlled purchase of marijuana." Response, 3.  A review of the testimony of Det. Clark and the CI reflects that while Det. Clark did admit that he drafted a report about a marijuana purchase – a report not included in the CI's file and thus far not disclosed to the undersigned– he failed to provide significant details of that "other operation" including his role, the operations true goal (to secure a firearm), and the key fact that the CI failed to fulfill his promise to secure a weapon:

> Q (by counsel for Mr. Jeter): And you don't recall any phone calls between him and – is it Officer Eshkenazi?
>
> A (by Det. Clark): *After we spoke about the firearm*, he also said that he would be able to make a purchase of marijuana, and that controlled purchase was done -- he was calling Detective Eshkenazi during that.
>
> Q: So he's calling Detective Eshkenazi to arrange another undercover operation?
>
> A: A controlled purchase, yes, sir.

Tr. of 9/12/14 Hearing, M-47 Lines 12:20 (emphasis added).  By noting that the marijuana purchase came "after we spoke about firearms" and often referencing the other operation as a mere "controlled purchase," Det. Clark attempted to minimize the importance of this matter and

incorrectly imply that it had nothing to do with firearms. Contrary to Det. Clark's assertions, the CI confirmed that the operation was to recover *both* drugs and a firearm. In fact, the CI confirmed that far from a mere "controlled purchase," the marijuana deal was merely a gateway to the CI's acquisition of a firearm. On this point, the undersigned had to stumble upon the details of this event - over vociferous government objection – during cross-examination of the CI:

Q (by the undersigned): You were attempting, you said, to do --

A (by the CI): **The whole point of the marijuana was to get the gun.**

Q: Okay. So what you're saying is that you were actually doing a purchase of -- not for drugs, but you were trying to get a gun?

A: Correct.

Q: And this is all happening on October 22nd?

A: Yes.

Q: And who is with you when this is happening?

A: The officers.

Q: Which officers? Detective Clark?

A: Yes. That drove me there. They wasn't with me the whole way, like walking inside the house.

Id. at M-133 Lines 10:22 (emphasis added).[3]

This failed recollection or outright distortion of the truth is continued in a search warrant affidavit authored by Det. Clark purportedly detailing the CI's involvement in the other operation.

---

[3] Further, Mr. Jeeter contends that Det. Clark repeatedly minimized his involvement in the other operation by responding to questions as though it was another detective who was responsible for that attempted purchase of marijuana. (Transcript of 9/12/14 Hearing, 47 Lines 18:20 ("Q: So he's calling Detective Eshkenazi to arrange another undercover operation? A: A controlled purchase, yes, sir.").

That affidavit, filed under separate cover and under seal to protect the CI, omits any reference of a firearm and instead paints the inaccurate picture that the CI's sole purpose in contacting the target of the search warrant was to secure marijuana. Affidavit, 1. Indeed, Det. Clark purposefully ignores the failed firearms acquisition by noting in that affidavit that individuals in the CDS trade (including, presumably, the target of the search) often "maintain firearms and ammunition to further their interests in the narcotics trade." Affidavit, 4. Of course, the affidavit omits any mention of the fact that Det. Clark had tried and failed, through the CI, to secure a gun from that exact target at that exact residence, a fact that seemingly contradicts the claim that the target "maintains firearms and ammunition."[4] The CI was known to the officers to be unreliable.

**4. The Government Ignores the Fact that the Det. Clark and Sgt. Davis Could Not Have Made the Observations They Alleged.**

The government also fails to address the extensive testimony of defense investigator William Kanwisher establishing that the alleged observations offered by Det. Clark and Sgt. Edward P. Davis were, at best, inaccurate. Sgt. Davis testified that he arrived at the CI's vehicle as Mr. Jeter was running toward it:

> Q (by AUSA Hoff): And you indicated you saw the Defendant go somewhere. Where was that?
>
> A (by Sgt. Davis): He was coming towards the car rapidly.
>
> Q: Did he enter any part of the vehicle?

---

[4] The affidavit, like Det. Clark's testimony on September 12 and the Statement of Probable Cause in this matter, contains additional misrepresentations, critical omissions, and/or discrepancies with the testimony of other witnesses. Many of these "issues" related to his testimony have been chronicled in oral argument and in prior filings. As to the affidavit, I encourage the Court to read Det. Clark's summary of probable cause in that "other matter" and compare it to the testimony of Det. Clark (Tr. of 9/12/14 Hearing, M-57:52) and the CI (Id. at M-128:139).

A: He entered the front passenger side -- right passenger side.

Q: And what did you observe at that point?

A: He had an object that was black, and I observed him toss it through the back of the seats, and, when I observed that, I was beside the car. I observed a sweatshirt land and a gun fall out, land on the floorboard of the -- back behind the driver seat.

Tr. of 9/12/14 Hearing, M-172 Lines 5:16. But Mr. Kanwisher established that if Sgt. Davis and Det. Clarke drove from their vantage point on Streeper Street on the command from Det. Hill (and the CI) that Mr. Jeter was "leaving the house, moving rapidly," id. at Page M-170 Line 13, it was unlikely, perhaps impossible, to reach Mr. Jeter's location in time to see him running toward the vehicle. Tr. of 9/19/2014 Hearing, 34 Lines 16:18 (noting that the fastest he could reach Kenwood from Streeper was between 34 and 21 seconds, far longer than anyone running from 7 North Kenwood could reach the CI's car).

Mr. Jeter does not dispute that authorities seized him soon after he entered the vehicle on North Kenwood. What *is* in dispute is what authorities could have seen at, or before, the alleged seizure. On this point, even the government's own witnesses disagree. See Tr. of 9/12/14 Hearing, M-157 Lines 19:25 (memorializing the CI's clear recollection that, contrary to Det. Clark and Sgt. Davis' claims, Mr. Jeter had his hands in his pocket and was not carrying a sweatshirt when he ran to the car). The undersigned submits that Mr. Kanwisher's testimony establishes that Det. Clark's and Sgt. Davis' recollection that each saw Mr. Jeter as he entered the car and then saw him toss a sweatshirt and gun, respectively, is inaccurate.

**5. TFO Glenn's Testimony Established the Illegal Use of a Grand Jury Subpoena.**

As a final matter, the government wholly ignored the testimony elicited at the September 19, 2014 hearing regarding the Defendant's Motion to Suppress Cell Phone Evidence (ECF/CM # 35).

At that hearing TFO Mike Glenn confirmed all factual averments made by Mr. Jeter in his prior filings. Specifically, TFO Glenn confirmed that the government cannot reap the benefits of the "inevitable discovery" doctrine because "the fact making discovery inevitable" did not "'arise from circumstances *other than those disclosed by the illegal search itself.*'" United States v. Thomas, 955 F.2d 207, 211 (4th Cir. 1992) (citation omitted) (emphasis added). Specifically, TFO Glenn confirmed that:

- the government had no idea if Mr. Jeter's phone was among his possessions at BCDC prior to the illegal execution of the Grand Jury subpoena. Tr. of 9/19/2014 Hearing, 3 Line 13 (noting that TFO Glenn first went to BCDC "[t]o ascertain *if* Mr. Jeter had a cell phone in his property.") (emphasis added).

- the government expressly relied on the Grand Jury subpoena to both learn of and seize Mr. Jeter's phone since authorities at BCDC refused to disclose an inventory of Mr. Jeter's property. Id. at 9 Lines 16:20.

- the authorities utilized unique identifying information learned only after the phone was seized (and manipulated by police) pursuant to the unlawful Grand Jury subpoena to secure the search warrant to search the phone. Id. at 10-13 (noting that TFO Glenn completed the affidavit in support of the search warrant only after seizing the phone and collecting unique identifying information from it including the make, model, serial number, and ME ID number and including that information in the search warrant affidavit).

- the government improperly served the subpoena by facsimile. Id. at 13 Lines 18:20. See United States v. Crossland, 821 F. Supp 1123, 1128 n.5 (E.D.V.A. 1993) (granting a motion to quash a Grand Jury subpoena served via fax and noting: "Also somewhat questionable is the use of facsimile transmission to effect service. It is unclear whether facsimile transmission is contemplated by Rule 17(d)'s reference to "delivering" the subpoena. In the civil context, several courts have found that facsimile transmissions do not constitute valid service under Rule 5(b) of the Federal Rules of Civil Procedure.").

- the government made no effort whatsoever to follow-up on the subpoena to ensure prompt compliance. Tr. of 9/19/2014 Hearing, 13-14 Lines 25, 1:3.

As noted in Mr. Jeter's Reply, the Court must evaluate the legality of the search warrant by excising the information illegally obtained from the improper use of the Grand Jury subpoena. See

Miller v. Prince George's County, MD, 475 F.3d 621, 628 (4th Cir.2007) ("To determine materiality, a court must excise the offending inaccuracies . . . and then determine whether or not the 'corrected' warrant affidavit would establish probable cause.") (internal quotation marks omitted). Based on the testimony of TFO Glenn, the Court must excise from the warrant application the very existence of a phone and all its unique identifying features and numbers.[5] Removing these items from the affidavit guts it beyond repair. Mr. Jeter's cell phone, and the information taken from it, must be suppressed.

For these reasons, those included in prior filing, and those argued at the hearings on motions in this matter, the Court should grant all outstanding motions to suppress evidence.

Respectfully submitted,

JAMES WYDA
Federal Public Defender

/s/

BRENDAN A. HURSON (Bar # 28179)
Assistant Federal Public Defender
100 South Charles Street
Tower II, Ninth Floor
Baltimore, Maryland 21201
(410) 962-3962 (p)
(410) 962-0872 (f)
brendan_hurson@fd.org

[5] It bears noting that TFO Glenn never testified that the phone recovered from BCDC was collected at or near the time of Mr. Jeter's arrest. This fact, too, was merely assumed from the compliance with the Grand Jury subpoena and must be excised.